# **EXHIBIT A**

**SCHEDULE 1 — THE AMENDED RESTRUCTURING PLAN**

---

**THE RESTRUCTURING PLAN FOR JSC ASTANA FINANCE
AS AMENDED**

---

including amendments to be approved in accordance with the laws of the Republic of Kazakhstan
during the course of 2015

---

**(English translation)**

---

# CONTENTS

**Article**                                                                                                            **Page**

1.      DEFINED TERMS ..............................................................................................2

2.      INTERPRETATION.............................................................................................14

3.      RESTRUCTURING DATE, CONDITIONS PRECEDENT AND IMPACT
        OF RESTRUCTURING .......................................................................................15

4.      RESTRUCTURING ............................................................................................15

5.      DETERMINATION OF AGREED CLAIMS ...........................................................19

6.      DISTRIBUTION; FULL AND FINAL SETTLEMENT OF CLAIMS .....................26

7.      TAXES................................................................................................................29

8.      DISTRIBUTION AGENT ARRANGEMENTS .........................................................29

9.      GENERAL PROVISIONS ..................................................................................30

10.     EXPECTED IMPACT OF THE RESTRUCTURING ON OTHER
        MEMBERS OF THE BANKING CONGLOMERATE................................................36

11.     EXPECTED FINANCIAL RESULTS OF THE RESTRUCTURING .....................40

APPENDIX 1  LIST OF DESIGNATED FINANCIAL INDEBTEDNESS...........................42

APPENDIX 2  FORM OF DEED OF RELEASE ....................................................................52

1.    **DEFINED TERMS**

"**2014 Amendments**" means the amendments to the Original Restructuring Plan approved in accordance with the laws of Kazakhstan during the course of 2014, an English translation of which is included in Part A of Schedule 1 to the 2014 Information Memorandum.

"**2014 Information Memorandum**" means the information memorandum of the Company relating to the Restructuring dated 14 February 2014 as amended from time to time.

"**2014 Restructuring Plan**" means the Original Restructuring Plan as amended by the 2014 Amendments.

"**Additional Domestic Debt**" means the Company's RUR-denominated debt owed to JSC Investment Fund of Kazakhstan and the Company's Dollar-denominated debt owed to JSC Bank CenterCredit.

"**Adjudication Reference Date**" means the date by which any Claim (other than a Previously Agreed Claim) has not been agreed by the Company which shall be as specified in the Restructuring Timetable or such other date as the Company may announce via a Regulatory Information Service, the Clearing Systems and its website at www.af.kz.

"**Advisors**" means Sidley Austin LLP, GRATA Law Firm, Dechert LLP, Dechert Kazakhstan Limited, Allen & Overy LLP, KPMG Audit LLC, KPMG Tax and Advisory LLC and any other advisor to the Company, its Subsidiaries and the Creditors' Committee appointed in relation to the Restructuring.

"**AF Leasing**" means JSC Leasing Company Astana Finance, a Subsidiary of the Company incorporated in Kazakhstan with No: 20712 1901 AO, whose registered office is at 28 Kabanbay batyra Ave. Astana 010000, Kazakhstan.

"**Agreed Claim**" means a Claim, the Outstanding Amount of which is determined and has either (i) been agreed by the Company or (ii) otherwise been determined in accordance with the provisions of the Restructuring Plan.

"**Agreed Claimant**" means a Claimant with an Agreed Claim. For the avoidance of doubt, if a Claimant has both an Agreed Claim and a Claim which has not yet been agreed, it shall be treated for the purposes of the Restructuring Plan as an Agreed Claimant only in respect of its Agreed Claim.

"**Astana Finance B.V.**" means Astana Finance B.V., a Subsidiary of the Company incorporated in the Netherlands, with registered number 24388831, whose registered office is at Westblaak 89, 3012 KG Rotterdam, the Netherlands.

"**Business Day**" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London, Almaty and New York City.

"**CAD**" means the Canadian Dollar, the legal currency of Canada.

"**Cash Element**" has the meaning ascribed to it in Article 4.2(i)(A).

"**CHF**" means the Swiss Franc, the legal currency of Switzerland.

"**Claim**" means any claim on a Debtor arising out of any Designated Financial Indebtedness.

"**Claimant**" means any person with a Claim on any Debtor including, without limitation, Eurobondholders (and the Existing Trustees both in their own right and on behalf of the relevant Eurobondholders), Private Placement Noteholders, Domestic Claimants and Trade Finance Creditors.

"**Claim Form**" means the form for the notification of a Claim which has been provided to the Claimants in the Company's Information Memorandum.

"**Claims Submission Date**" means the date by which Claim Forms must be submitted which shall be as specified in the Restructuring Timetable or such other date as may be notified to Claimants by announcement via a Regulatory Information Service, through the Clearing Systems and on the Company's website at www.af.kz.

"**Clearing System**" means each or both of Euroclear or Clearstream, depending on the circumstances.

"**Clearstream**" means Clearstream Banking, société anonyme, Luxembourg.

"**Collateral Subsidiaries**" means companies which are Subsidiaries of the Company only as a result of the enforcement of loan collateral.

"**Company**" means JSC Astana Finance.

"**Completion Date**" means the date on which the SIEC issues the Completion Order.

"**Completion Order**" means the order issued by the SIEC confirming that the Restructuring has been completed on the basis of the provisions of the Restructuring Plan having been implemented.

"**Conditions Precedent**" means the conditions precedent listed in Schedule 10 (*Conditions Precedent to the Restructuring Becoming Effective*) of the Information Memorandum.

"**CP Notice**" has the meaning specified in Article 3.3 of the Restructuring Plan.

"**Creditors' Committee**" means the International Creditors' Committee from time to time representing certain Claimants, and consisting of, as at the date of the Information Memorandum, Banco Finantia SA, Franklin Templeton Investment Management Limited, Outrider Management LLC, Portland Worldwide Investments Ltd. and VR Capital Group.

"**DAMU**" means JSC Entrepreneurship Development Fund DAMU.

"**DAMU Claim Amount**" means the Liabilities of the Company arising out of or in connection with the DAMU Loan N. 18 up to and excluding the Distribution Date (including any unpaid principal amount, any unpaid interest and Default Interest).

"**DAMU Debt Claim**" means DAMU's Claim arising out of or in connection with DAMU Loan N. 18.

"**DAMU Loan N. 2**" means the loan agreement number 2-СФ dated 24 June 2008 entered into between the Company (as borrower) and DAMU (as lender) under the Karaganda Region Programme on Financing Small Business.

"**DAMU Loan N. 18**" means the loan agreement number 18 dated 18 August 2008 entered into between the Company (as borrower) and DAMU (as lender).

"**DAMU Loan N. 24**" means the loan agreement number 24-CΦ dated 12 August 2008 entered into between the Company (as borrower) and DAMU (as lender) under the Karaganda Region Programme on Financing Small Business.

"**Debtors**" means the Company, AF Leasing, AF Mortgage and Astana Finance B.V.

"**Deed of Release**" means the deed to be entered into by the Company on the Distribution Date on behalf of Claimants pursuant to the Restructuring Plan, substantially in the form set out in Appendix 2 (*Form of Deed of Release*) hereto.

"**Default Interest**" means the interest payable on overdue amounts under any financial obligation which accrues from the due date of the overdue amount up to the date of the actual payment.

"**Definitive Holder**" means the registered holder of a Eurobond or a Private Placement Note, as the case may be, in definitive registered form.

"**Deposit Agreement**" means the deposit agreement to be entered into between the Company and the Depositary relating to the issuance of the GDRs.

"**Depositary**" means The Bank of New York Mellon (or any successor thereof) in its capacity as depositary pursuant to the Deposit Agreement and as agent of the Company to assist the Company, *inter alia*, with the distribution of the GDRs in accordance with the Restructuring Plan.

"**Deposited Shares**" means the Shares which will be registered in the name or on behalf of the Depositary or its nominee and in respect of which GDRs will be issued in accordance with and pursuant to the terms of the Deposit Agreement.

"**Designated Account**" means the account specified by a Claimant in the Distribution Instructions into which deliveries of such Claimant's Entitlement shall be made or, in the case of Non-U.S. Claimants whose Designated Financial Indebtedness is held in an account with the Clearing Systems, the account with the relevant Clearing System in which the Designated Financial Indebtedness is held.

"**Designated Financial Indebtedness**" means all Indebtedness and Indebtedness Guarantees of the Debtors (including, without limitation, that set out in Appendix 1 (*List of Designated Financial Indebtedness*) to the Restructuring Plan), but excluding Excluded Debt.

"**Disputed Claim**" means a Claim which has not been agreed by the Company on or before the Adjudication Reference Date and is referred (in whole or in part) to the Independent Adjudicator.

"**Distribution**" means the distribution of the Entitlements or the Net Proceeds of Sale, as the case may be, to each Claimant with an Agreed Claim in accordance with Article 6 of the Restructuring Plan.

"**Distribution Agent**" means The Bank of New York Mellon, London Branch (or any successor thereof) acting as agent of the Company to assist the Company with the Distribution (save for the distribution of GDRs in so far as these have been distributed by the Depositary, the Letter of Obligation, the Entitlements of Preference Shareholders and the Entitlements of holders of Operational Debt Claims).

"**Distribution Agent Agreement**" means the agreement dated 12 May 2014 entered into between the Company and the Distribution Agent pursuant to which the Distribution Agent will assist the Company in the distribution of certain Entitlements.

"**Distribution Announcement**" has the meaning specified in Article 1.1(c) of the Restructuring Plan.

"**Distribution Date**" means the date specified in the Restructuring Timetable, or such other date as may be notified to Claimants by announcement via a Regulatory Information Service, through the Clearing Systems and on the Company's website at www.af.kz, as the date on which the Distribution Agent, the Depositary and the Company, as applicable, will carry out the Distribution.

"**Distribution Instructions**" means the instructions to be given by certain Claimants with Agreed Claims in accordance with Article 6.1 specifying such information as is necessary for the Distribution Agent, the Depositary, the Company or any other person on the Company's behalf to distribute a Claimant's Entitlement, including Designated Account details and details of the Nominated Recipient (if applicable). The form and content of these instructions have been provided to the Claimants in the Information Memorandum.

"**Distribution Submission Date**" means the date by which Claimants (other than those Claimants specified in Article (b)) must provide the Company and the Tabulation Agent with Distribution Instructions which shall be as specified in the Restructuring Timetable or such other date as may be notified to Claimants by an announcement via a Regulatory Information Service, through the Clearing Systems and on the Company's website at www.af.kz.

"**Dollar Recovery Notes**" means the U.S.$50,000,000 in aggregate initial Reference Amount of Recovery Notes due 2024 to be issued by the Company pursuant to the Restructuring Plan.

"**Domestic Bondholders**" means the holders of Domestic Bonds as determined by the records of the Registrar.

"**Domestic Bonds**" means the Domestic Debt issued by the Company in the form of Tenge-denominated debt securities.

"**Domestic Claimants**" means any Claimant with a Claim in respect of Domestic Debt. For the avoidance of doubt, if a Claimant has both an Agreed Claim for International Debt and an Agreed Claim for Domestic Debt, it shall be treated for all purposes of the Restructuring Plan as a Domestic Claimant only in respect of its Agreed Claim for Domestic Debt.

"**Domestic Debt**" means Designated Financial Indebtedness denominated in Tenge and the Additional Domestic Debt.

"**Domestic Senior Claimants**" means Claimants with a Claim in respect of Domestic Senior Debt.  For the avoidance of doubt, if a Claimant has both an Agreed Claim for Domestic Senior Debt and an Agreed Claim for Domestic Subordinated Debt, it shall be treated for the purposes of the Restructuring Plan as a Domestic Senior Claimant only in respect of its Agreed Claim for Domestic Senior Debt.

"**Domestic Senior Debt**" means any Tenge-denominated notes issued by the Company, the terms of which state that such Tenge-denominated notes are unsubordinated or do not provide for subordination.

"**Domestic Subordinated Claimants**" means Claimants with a Claim in respect of Domestic Subordinated Debt. For the avoidance of doubt, if a Claimant has both an Agreed Claim for

Domestic Senior Debt and an Agreed Claim for Domestic Subordinated Debt, it shall be treated for the purposes of the Restructuring Plan as a Domestic Subordinated Claimant only in respect of its Agreed Claim for Domestic Subordinated Debt.

"**Domestic Subordinated Debt**" means any Tenge-denominated notes issued by the Company, the terms of which state that such Tenge-denominated notes are subordinated, and the Additional Domestic Debt.

"**ECAs**" mean certain export credit agencies (namely, Finnvera plc, Export Development Canada, Export-Import Bank of the United States of America, Euler Hermes Kreditversicherungs – AG, Swiss Export Risk Insurance, Compañia Española De Seguros De Créditos a la Exportación S.A. and Kuke S.A.).

"**Entitlement**" means the entitlement to the Cash Element, New Notes, Deposited Shares represented by the GDRs, the Letter of Obligation, cash amounts and/or dividends, as determined in accordance with Article 4.2 of the Restructuring Plan, of each Claimant with an Agreed Claim.

"**Electronic Voting Instructions**" refers to the voting instructions submitted by Eurobondholders (in respect of the relevant New Eurobondholders' Meeting(s) or New Claimants' Meeting, as the case may be) or Private Placement Noteholders (in respect of the New Claimants' Meeting) through the relevant Clearing System.

"**EUR**" or "**€**" means the lawful currency of the participating Member States of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community.

"**Eurobondholder**" means a person with the ultimate economic interest in any of the Eurobonds and holding such interest in such Eurobonds through one of the Clearing Systems or as a Definitive Holder from time to time, unless specifically stated otherwise.

"**Eurobonds**" means (i) the EUR340,000,000 7.875 per cent. Notes due 2010 (ISIN: XS0304676637), the US$10,000,000 Floating Rate Notes due 2011 (ISIN: XS0359435012) and the US$35,000,000 14.50 per cent. Notes due 2013 (ISIN: XS0373189579), in each case, issued by Astana Finance B.V. under the US$2,000,000,000 Global Medium Term Note Issuance Programme and (ii) the Standalone Issue.

"**Euroclear**" means Euroclear Bank SA/NV, as operator of the Euroclear system.

"**Excluded Debt**" means:

(i)     claims of DAMU arising out of or in connection with each of DAMU Loan N. 2 and DAMU Loan N. 24;

(ii)    claims of the Astana and Atyrau City Construction Administrations in the total amount (including principal and interest) of approximately KZT1.31 billion with a final maturity in 2016;

(iii)   claims of Preference Shareholders of the Company, excluding the Preference Share Debt Claims;

(iv)    claims of suppliers of goods or services for the ordinary conduct of the Company's operations, excluding the Operational Debt Claims;

(v)     debt owed by the Company to its Subsidiaries;

(vi)     the EUR22,706,000 in principal amount of EUR340,000,000 7.875 per cent. Notes due 2010 (ISIN: XS0304676637) and U.S.$1,418,000 in principal amount of U.S.$175,000,000 9 per cent. Notes due 2011 (ISIN: XS0275278256), in each case held by or for the account of the Company;

(vii)    claims of the Creditors' Committee, the ECAs, the New Trustee, Dunhill Finance Limited  and Astana Finance B.V. and/or each of their respective advisors for outstanding fees, costs and expenses payable by the Company under the relevant appointment or fee letters;

(viii)   claims of the Advisors for outstanding fees, costs and expenses payable by the Company; and

(ix)     each Existing Trustee's rights to unpaid remuneration and expenses and indemnity payments by the Company and its Subsidiaries.

"**Existing Trustees**" means BNY Mellon Corporate Trustee Services Limited (formerly known as BNY Corporate Trustee Services Limited) in respect of the Standalone Issue, and Citicorp Trustee Company Limited in respect of the Eurobonds other than the Standalone Issue, or, in each such case, any successor trustee appointed in accordance with the provisions of the Trust Deeds.

"**FMSA**" means the Agency for the regulation and supervision of the financial market and financial organisations whose responsibilities were transferred in 2011 to the FMSC.

"**FMSA Agreement**" means the agreement No. 02-03-12/383/5051-И entered into between the FMSA, the Company and certain of its subsidiaries on 19 March 2010 which imposed bans on intra-group transactions or arrangements that would result in the transfer of the Company's losses or risk to those subsidiaries.

"**FMSC**" means the Committee for the Control and Supervision of the Financial Market and Financial Organizations of the National Bank of the Republic of Kazakhstan whose responsibilities were transferred in 2014 to the NBK.

"**GDRs**" means the depositary receipts issued by the Depositary representing interests in the Deposited Shares.

"**Government**" means the government of the Republic of Kazakhstan.

"**Group**" means the Company and its Subsidiaries (excluding the Collateral Subsidiaries).

"**Indebtedness**" means any obligation (whether incurred as principal, as surety, or as guarantor) for the payment or repayment of money, whether present or future, actual or contingent.

"**Indebtedness Guarantee**" means, in relation to any Indebtedness of any person, any obligation of another person to pay such Indebtedness, including (without limitation) (i) any obligation to purchase such Indebtedness, (ii) any obligation to lend money, to purchase or subscribe shares or other securities or to purchase assets or services in order to provide funds for the payment of such Indebtedness, (iii) any indemnity against the consequences of default in the payment of such Indebtedness and (iv) any other agreement to be responsible for repayment of such Indebtedness.

"**Independent Adjudicator**" has the meaning ascribed to it in Article 1.1(a) of the Restructuring Plan.

"**Independent Holder**" has the meaning ascribed to it in Article 1.1(f) of the Restructuring Plan.

"**Information Memorandum**" means the information memorandum dated 6 March 2015 published by the Company in relation to the Restructuring, as amended, restated and/or supplemented from time to time.

"**International Claimants**" means Claimants with a Claim in respect of International Debt, which includes, without limitation, the Eurobondholders, the Private Placement Noteholders and the Trade Finance Creditors. For the avoidance of doubt, if a Claimant has both an Agreed Claim for International Debt and an Agreed Claim for Domestic Debt, it shall be treated for the purposes of the Restructuring Plan as an International Claimant only in respect of its Agreed Claim for International Debt.

"**International Debt**" means Designated Financial Indebtedness denominated in a currency other than Tenge, with the exception of the Additional Domestic Debt.

"**JPY**" means Japanese Yen, the lawful currency of Japan.

"**JSC Law**" means the Law of the Republic of Kazakhstan on Joint Stock Companies dated 13 May 2003, as amended.

"**Kazakhstan**" means the Republic of Kazakhstan.

"**LCIA**" means the London Court of International Arbitration.

"**Letter of Obligation**" means the letter of obligation to be issued by the Company for the benefit of DAMU in respect of the New DAMU Payable and comprising DAMU's entitlement under the Restructuring Plan.

"**Liability**" or "**Liabilities**" means any debt, financial liability or obligation whatsoever whether it is present, future or prospective, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, or in any other manner whatsoever, but such expression does not include any liability which is barred by statute or is otherwise unenforceable or arises under a contract which is void or, being voidable, has been duly avoided.

"**NBK**" means the National Bank of Kazakhstan.

"**Net Proceeds of Sale**" means the proceeds of sale of the relevant New Notes and GDRs net of all associated commissions, transfer taxes and other costs, including the expenses and compensation of the Distribution Agent, the Depositary, the Company, or any other party on the Company's behalf, as the case may be, in effecting such sale.

"**New Claimants' Meeting**" means the meeting of Claimants (including the Existing Trustees) convened to consider and, if thought fit, approve the Restructuring Plan, including any adjournment thereof.

"**New DAMU Payable**" means a new payment obligation created by the Company in favour of DAMU for a principal amount equal to the New DAMU Principal Amount on the following terms: (i) the payment obligation is to mature in 2020 on the date which falls on the fifth anniversary of the Distribution Date; (ii) the New DAMU Principal Amount will bear interest at a rate of 4.5 per cent. per annum, capitalised annually and payable in full at

maturity; and (iii) the New DAMU Principal Amount is to be repaid in 10 equal semi-annual instalments commencing on the date which falls six months after the Distribution Date.

"**New DAMU Principal Amount**" means an amount equal to the aggregate of (i) the amount of unpaid principal on the DAMU Loan N. 18 plus (ii) an amount equal to the unpaid interest on the DAMU Loan N. 18 calculated at a rate of 7.5 per cent. per annum up to and excluding 21 November 2012 and at a rate of 4.5 per cent. per annum from and including 21 November 2012 up to and excluding the Distribution Date.

"**New Eurobondholders' Meeting**" means a meeting of the Eurobondholders of a series of Eurobonds to consider and, if thought fit, approve the New Extraordinary Resolution.

"**New Extraordinary Resolution**" means the extraordinary resolution to be proposed at the relevant New Eurobondholders' Meeting to approve, among other things, the Restructuring Plan, requiring a majority of not less than 75 per cent. of the persons voting or their representatives thereat upon a show of hands or, if a poll is duly demanded, by a majority consisting of not less than 75 per cent. of the votes cast.

"**New Notes**" means the Dollar Recovery Notes and the Tenge Notes.

"**New Trustee**" means BNY Mellon Corporate Trustee Services Limited in its capacity as trustee and any successor trustee appointed in connection with the New Notes.

"**Nominated Recipient**" means the person specified as such in the relevant Distribution Instructions.

"**Non-Exempt Claimant**" means any Claimant other than a Claimant who is not required to notify the Company of its Claim under Article (c).

"**Non-U.S. Claimant**" means a Claimant who is not and is not acting for a U.S. Person, within the meaning of Regulation S under the Securities Act.

"**Note Redemption Date**" means the first date on which none of the Dollar Recovery Notes remains outstanding.

"**Operational Debt Claim**" means any Claim of the Company's suppliers of goods and services for the ordinary conduct of the Company's operations which a court in Kazakhstan has ordered to be subject to the Restructuring and in respect of which such court has issued a judgment for debt collection.

"**Original Claimants' Meeting**" means the meeting of Claimants which was held on 29 June 2012 to consider and approve the Original Restructuring Plan.

"**Original Restructuring Plan**" means the restructuring plan of the Company (which includes, amongst other things, the Restructuring Terms as set out in Schedule 1 of the supplemental information memorandum dated 22 June 2012 published by the Company in relation to the Restructuring) which was approved by two thirds (by value) of Claimants at the Original Claimants' Meeting, the NBK on 4 July 2012 and the Specialised Financial Court on 31 July 2012.

"**Outstanding Amount**" means:

(i)     in relation to an Agreed Claim in respect of any Designated Financial Indebtedness other than the DAMU Debt Claim, Operational Debt Claims and Preference Share Debt Claims (and in each case excluding the default element of any interest), the

Principal Amount of such Agreed Claim as of and including 31 December 2010 plus Restructured Interest; or

(ii)     in relation to an Agreed Claim in respect of an Operational Debt Claim, the amount specified in the relevant judgment for debt collection; or

(iii)    in relation to an Agreed Claim in respect of a Preference Share Debt Claim, the amount of unpaid dividends calculated, in accordance with the applicable relevant laws in Kazakhstan and the Company's Charter, in respect of the holdings specified against the name of the relevant Preference Shareholder on the Company's register of Shareholders; or

(iv)    in relation to an Agreed Claim in respect of the DAMU Debt Claim, (a) the Principal Amount of the DAMU Debt Claim plus any interest accrued on such Principal Amount (but excluding any Default Interest) up to but excluding the date of the New Claimants' Meeting, for the purpose of determining the value to be voted by DAMU at the New Claimants' Meeting, and (b) the DAMU Claim Amount, for the purpose of calculating the value of the DAMU Debt Claim for any other purpose.

"**Post**" means delivery by pre-paid first class post or air mail.

"**Preference Share Debt Claims**" means the Claims of Preference Shareholders in relation to unpaid dividends on the Preference Shares of KZT577,500,000 in aggregate which were due and payable in 2009.

"**Preference Shares**" means the outstanding preference shares of the Company.

"**Preference Shareholders**" means the holders of any Preference Shares.

"**Previous Claimant**" means a Claimant who had previously submitted, or on whose behalf an Existing Trustee or the Tabulation Agent had previously submitted, a Claim in 2012 and/or in 2014 in connection with the Original Restructuring Plan or the 2014 Restructuring Plan, as applicable.

"**Previously Agreed Claim**" means a Claim that has been determined to be an Agreed Claim by the Independent Adjudicator in accordance with Article 5.4 of the Original Restructuring Plan.

"**Principal Amount**" means, in respect of the Designated Financial Indebtedness held by each Claimant (other than Operational Debt Claims, the DAMU Debt Claim and Preference Share Debt Claims), the undiscounted nominal amount of such Designated Financial Indebtedness outstanding on 31 December 2010 as finally determined in accordance with the provisions of the Restructuring Plan.

"**Private Placement Notes**" means (i) the U.S.$55,000,000 Series B Notes due 2012 (ISIN: XS0290775500), (ii) the €10,000,000 Series C Notes due 2012 (ISIN: XS0290779320), and (iii) the JPY 11,000,000,000 Floating Rate Senior Notes due 2017 (ISIN: XS0338313074).

"**Private Placement Noteholders**" means a person with the ultimate economic interest in any of the Private Placement Notes and holding such interest in such Private Placement Notes through one of the Clearing Systems or as a Definitive Holder from time to time, unless specifically stated otherwise.

"**Proceeding**" means any process, action, or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review,

adjudication, execution, seizure, distraint, forfeiture, re entry, lien, enforcement of judgment or enforcement of any security).

"**Record Date**" means 20 March 2015 being the last date on which a Claim (including Eurobonds and Private Placement Notes) can be transferred to another person for the purposes of voting in the New Eurobondholders' Meetings and the New Claimants' Meetings, which shall be as specified in the Restructuring Timetable or such other date as the Company shall announce via a Regulatory Information Service or its website at www.af.kz.

"**Registrar**" means JSC "Integrated Securities Registrar" or any successor thereto.

"**Regulation S**" means Regulation S of the U.S. Securities Act.

"**Regulatory Information Service**" means any of RNS provided by the Regulatory News Services of the London Stock Exchange; Business Wire Regulatory Disclosure provided by Business Wire Europe Ltd.; News Release Express provided by Marketwired; Disclose provided by PR Newswire; marCo – Market Communication Office provided by Tensid Ltd.; EQS IR COCKPIT provided by EQS Group AG; ONE provided by NASDAQ OMX Corporate Services; Bloomberg News provided by Bloomberg LP or any other international newswire service used by the Company from time to time.

"**Release Parties**" has the meaning ascribed to it in Article 4.7 of the Restructuring Plan.

"**Restructured Interest**" means, in relation to the Designated Financial Indebtedness other than Operational Debt Claims, the DAMU Debt Claim, and Preference Share Debt Claims, all accrued but unpaid interest up to and including 31 December 2010 (excluding Default Interest).

"**Restructuring**" means the proposed overall restructuring and/or cancellation of certain of the debts and other financial obligations of the Debtors pursuant to, amongst other things, the Restructuring Plan.

"**Restructuring Date**" means the date on which the Restructuring Date Confirmation is issued by the Distribution Agent (whether or not received by all addresses on that date).

"**Restructuring Date Confirmation**" means a confirmation given by fax or email by the Distribution Agent to the Company, the ECAs, the Creditors' Committee and the Existing Trustees or their respective legal counsel, that the Entitlements (other than the Net Proceeds of Sale, the Letter of Obligation and the Entitlements of Preference Shareholders and of holders of Operational Debt Claims) have been paid or delivered to the relevant Designated Accounts in accordance with Article 6 of the Restructuring Plan.

"**Restructuring Deadline**" means 31 May 2015 or any subsequent date that may be stipulated by the SIEC as the date by which the Restructuring is to be completed.

"**Restructuring Law**" means any normative legal act of the Republic of Kazakhstan regulating the special restructuring regime provided for in Section 6-1 (Bank Restructuring) of the Law of the Republic of Kazakhstan "On Banks and Banking Activity" No 2444 dated 31 August 1995, as amended.

"**Restructuring Plan**" means the Original Restructuring Plan (in the Russian language) as amended by the 2014 Amendments and as further amended hereby. If there is any inconsistency between the Restructuring Plan in Russian and the English translation thereof, the Restructuring Plan in Russian shall prevail for all purposes.

"**Restructuring Timetable**" means the expected timetable for principal events in relation to the Restructuring set out in Article 9.9 as it may be amended from time to time.

"**RUR**" means Russian Roubles, the lawful currency of Russia.

"**Russia**" means the Russian Federation.

"**Samruk-Kazyna**" means JSC National Welfare Fund Samruk-Kazyna.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Shares**" means common shares in the Company.

"**SIEC**" means the Specialised Inter-district Economic Court of Almaty (or any other court or tribunal that is a successor to it in having jurisdiction over the Restructuring under the laws of Kazakhstan).

"**Specialised Financial Court**" means the Specialised Financial Court of Almaty whose responsibilities were transferred in 2014 to the SIEC.

"**Standalone Issue**" means the US$175,000,000 9.00 per cent Notes due 2011 (ISIN: XS0275278256) issued by Astana Finance B.V.

"**Subsidiary**" means, in relation to any person:

(a)     an entity of which that person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting shares or similar right of ownership; or

(b)     an entity whose financial statements are, in accordance with applicable law and generally accepted accounting principles, consolidated with those of that person.

"**Tabulation Agent**" means Lucid Issuer Services Limited its capacity as tabulation agent with respect to the Restructuring.

"**Tenge**" or "**KZT**" means Kazakhstan Tenge, the lawful currency of Kazakhstan.

"**Tenge Notes**" means the KZT19,954,603,000 in aggregate principal amount of Zero Coupon Tenge Notes due 2018 to be issued by the Company pursuant to the Restructuring Plan.

"**Trade Finance Creditor**" means any Claimant which holds a Claim that is Trade Finance Debt.

"**Trade Finance Debt**" means (i) all debt owed by the Company or AF Leasing to any ECA and (ii) all debt owed by the Company or AF Leasing to any other Claimant where such debt is guaranteed, insured or otherwise covered in whole or in part by an ECA (provided that where such debt is only covered in part by an ECA, the whole amount of such debt shall constitute Trade Finance Debt and not merely the part of such debt to which the ECA cover relates).

"**Trust Deeds**" means (i) the trust deed dated 16 November 2006 between Astana Finance B.V., the Company, AF Leasing and BNY Mellon Corporate Trustee Services Limited (formerly known as BNY Corporate Trustee Services Limited) relating to the Standalone Issue and (ii) the trust deed dated 23 May 2007 between Astana Finance B.V., the Company, AF Leasing and Citicorp Trustee Company Limited relating to the US$2,000,000,000 Global Medium Term Note Programme and relating to the Eurobonds other than the Standalone Issue.

"**US Dollars**", "**Dollar**", "**$**" or "**US$**" means United States Dollars, the lawful currency of the United States.

2.    **INTERPRETATION**

Unless the context or the express provisions of the Restructuring Plan otherwise require, the following shall govern the interpretation of the Restructuring Plan:

(a)    terms used herein and not otherwise defined have the meaning given to them in Article 1 (*Defined Terms*) of the Restructuring Plan;

(b)    references to an "**Article**" or an "**Appendix**" are, unless otherwise stated, references to an article or appendix of the Restructuring Plan;

(c)    references to a "**person**" include references to a natural person, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(d)    any reference in the Restructuring Plan to any legislation (whether primary legislation or regulations or other subsidiary legislation made pursuant to primary legislation) shall be construed as a reference to such statute, provision, statutory instrument, order or regulation as the same may have been, or may from time to time be, amended or re-enacted;

(e)    any reference in the Restructuring Plan to any agreement shall be construed as a reference to such agreement as it may have been amended, restated and/or supplemented;

(f)    words importing the singular shall include the plural and vice versa, and words importing the masculine gender shall include the feminine or neutral gender;

(g)    headings are for convenience only and shall not affect the interpretation of the relevant article of the Restructuring Plan.

3.    **RESTRUCTURING DATE, CONDITIONS PRECEDENT AND IMPACT OF RESTRUCTURING**

3.1    **Claimants will be irrevocably bound by the Restructuring Plan upon the issuance, in accordance with the Restructuring Law, of an order by the SIEC approving the Restructuring Plan provided that, if the Restructuring Date does not occur on or before the Restructuring Deadline, the Restructuring Plan shall terminate and cease to have effect.**

3.2    **Subject to Article 3.3 below, the issue and distribution of the Entitlements in accordance with the Restructuring Plan will be made:**

(i)    with respect to Preference Shareholders, on the day immediately following the Note Redemption Date;

(ii)    with respect to all other Claimants, on the Distribution Date.

GDRs shall not be transferable up to and including the day which is the Business Day following the date on which the first general meeting of the Company's shareholders following the completion of the Restructuring is held.

3.3    **No Entitlements (other than the Deposited Shares which shall be deposited with the Depositary some time prior of the Distribution Date will be issued or distributed**

pursuant to the Restructuring Plan unless the Company has received a notice in writing from the Creditors' Committee or its legal counsel (the "CP Notice") stating that the Conditions Precedent are in all material respects satisfied (for which purpose the Creditors' Committee shall be entitled to rely without further investigation on the officer's certificate and supporting evidence provided pursuant to Schedule 10 (*Conditions Precedent to the Restructuring Becoming Effective*) of the Information Memorandum) or waived (with the approval of the majority of the members of the Creditors' Committee).

3.4    The process and mechanics of the Restructuring are described below in Articles 4 to 6.

3.5    The procedures as to voting, deemed voting, submission of Claims and submission of Distribution Instructions as set out in the Information Memorandum and any sections of the Information Memorandum which are referred to in the Restructuring Plan will form an integral part of the Restructuring and of the Restructuring Plan.

4.    **RESTRUCTURING**

4.1    **Release of Claims**

(a)    As at and from the Restructuring Date, the Designated Financial Indebtedness (including, but not limited to, the Indebtedness listed in Appendix 1 hereto) shall be cancelled as set out herein and all Claims shall be deemed to be fully satisfied and released, in each case so as to bind both the Claimants and any person who acquires any interest in or arising out of a Claim after the Record Date.

(b)    Any issue or distribution of Entitlements to International Claimants or (except for Claimants with an Operational Debt Claim, DAMU, or Preference Shareholders) Domestic Claimants shall be deemed to be made against the Principal Amount of their Claims. The amount of Restructured Interest in respect of the foregoing Claims is used solely for the purposes of determining the aggregate principal amount of the Tenge Notes and, as at and from the Restructuring Date, shall be deemed to be cancelled by the International Claimants and the relevant Domestic Claimants in full and without any consideration.

(c)    Each Claimant with an Agreed Claim shall, subject to the other provisions of the Restructuring Plan, become entitled on the Business Day immediately following the Note Redemption Date (with respect to Preference Shareholders), or on the Distribution Date (with respect to all other Claimants) to have transferred to it or to its Nominated Recipient the relevant Entitlements determined in accordance with Article 4.2.

(d)    The Entitlement (or part thereof) of any Claimant with an Agreed Claim referred to in paragraph (c) above shall be satisfied in accordance with the provisions of Article 6.

4.2    **Entitlements of Claimants**

(a)    The Entitlement of each Claimant with an Agreed Claim shall be as follows:

(i)    each International Claimant shall be entitled to a pro rata portion (if necessary rounded down to the nearest whole Share in the case of GDRs and to the nearest denomination in the case of the New Notes) of the following:

(A)    US$300,000,000 in cash (the **"Cash Element"**);

(B)     Dollar Recovery Notes in the aggregate initial reference amount of US$50,000,000; and

(C)     GDRs, which will represent Deposited Shares comprising in aggregate not less than 99 per cent of the Company's total issued common share capital as of the Restructuring Date and, if necessary, after accounting for any issuance of Shares pursuant to the Restructuring;

(ii)     each Domestic Senior Claimant shall be entitled to a pro rata portion of the Tenge Notes in the aggregate principal amount of KZT14,691,986,700, representing an amount equal to 28 per cent. of Domestic Senior Debt;

(iii)    each Domestic Subordinated Claimant shall be entitled to a pro rata portion of the Tenge Notes in the aggregate principal amount of KZT5,262,616,300, representing an amount equal to 17 per cent. of Domestic Subordinated Debt;

(iv)    each Claimant with an Operational Debt Claim shall be entitled to a cash amount payable in Tenge equal to 15 per cent. of the Outstanding Amount of its Agreed Claim;

(v)     each Preference Shareholder shall be entitled to a cash amount payable in Tenge equal to the Outstanding Amount of its Agreed Claim *plus* an amount equal to interest on such Outstanding Amount accruing at a rate equivalent to the official refinancing rate established by the NBK on the date following the Note Redemption Date from the date on which the 2008 Dividends were originally due and payable up to but excluding the day immediately following the Note Redemption Date; and

(vi)    DAMU shall be entitled to the Letter of Obligation, a form of which is included (in the Russian language) in Schedule 13 in the Information Memorandum, exclusively to satisfy Kazakhstani law requirements. A summary of the terms of the Letter of Obligation can be found in the definition of the term "New DAMU Payable" contained herein.

(b)     Except for Claimants with an Operational Debt Claim or Preference Share Debt Claim or DAMU in respect of the DAMU Debt Claim, the pro rata portion of the Entitlement for each Claimant shall be determined as follows:

(i)     the pro rata portion of the Entitlement for each International Claimant shall be the same proportion as that which the Outstanding Amount of its Agreed Claim bears to the aggregate Outstanding Amount of Agreed Claims of all International Claimants;

(ii)    the pro rata portion of the Entitlement for each Domestic Senior Claimant shall be the same proportion as that which the Outstanding Amount of its Agreed Claim bears to the aggregate Outstanding Amount of Agreed Claims of all Domestic Senior Claimants; and

(iii)   the pro rata portion of the Entitlement for each Domestic Subordinated Claimant shall be the same proportion as that which the Outstanding Amount of its Agreed Claim bears to the aggregate Outstanding Amount of Agreed Claims of all Domestic Subordinated Claimants.

163

(c)     For the purposes of calculating the pro rata portion of the Entitlement for each International Claimant in accordance with Article 4.2(b)(i) above, the Outstanding Amount of any Agreed Claim that is denominated in currencies other than US Dollars shall be converted into US Dollars at the relevant exchange rate specified below:

    (i)     JPY 81.492 to US$1.00;

    (ii)    EUR1.00 to US$ 1.335;

    (iii)   CAD1.00 to US$ 1.002; or

    (iv)    CHF1.00 to US$ 1.067.

(d)     For the purposes of calculating the pro rata portion of the Entitlement for each Domestic Claimant in accordance with Article 4.2(b)(iii) above, the Outstanding Amount of any Agreed Claims that is denominated in currencies other than Tenge shall be converted into Tenge at the relevant exchange rate specified below:

    (i)     RUR1.00 to KZT2.66; or

    (ii)    US$1.00 to KZT184.45.

### 4.3    Interest on Claims

(a)     Restructured Interest is included in the relevant Claim.

(b)     On the Restructuring Date and except to the extent provided with respect to Preference Share Debt Claims and the DAMU Debt Claim, all interest in respect of Designated Financial Indebtedness and all Default Interest shall be deemed to have ceased to accrue on and from 1 January 2011 and, accordingly, any such interest or Default Interest accruing after 31 December 2010 shall be deemed never to have accrued and shall be cancelled in full by the relevant Claimants and will not form part of any Claim.

### 4.4    No Proceedings

The Claimants understand and irrevocably agree that, once the SIEC approves the Restructuring Plan, no Proceeding or other judicial, quasi judicial, administrative or regulatory process whatsoever against the Debtors, any of their respective Subsidiaries or property shall be commenced or continued in any jurisdiction whatsoever to recover any Claim or to establish the existence or amount of a Claim.

### 4.5    Transfers or other Disposals after the Record Date

(a)     No Debtor shall be under any obligation to recognise any transfer or other disposal of a Claim (in whole or in part) after the Record Date for the purposes of determining Entitlements under the Restructuring Plan and no Debtor shall have obligations hereunder to any person other than the original Claimant for such Claim, provided that, where the Company has received from the relevant parties notice in writing of a transfer or other disposal, the Company may, in its sole discretion and subject to the production of such other evidence in relation to such transfer or other disposal as the Company may require and to any other terms and conditions which the Company may consider necessary or desirable, agree to recognise such transfer or other disposal for the purposes of making distributions under the Restructuring Plan. With respect to a transfer or other disposal of a Claim (in whole or in part) so recognised,

the person(s) to whom such Claim or part thereof has been transferred or otherwise disposed of (the **"Transferee"**) shall be bound by the provisions of the Restructuring Plan. Upon transfer or other disposal of a Claim (in whole or in part) after the Record Date, a Claimant shall set out, in the terms and conditions of such transfer or other disposal of a Claim or part thereof, the Company's rights under this Article 4.5(a), the Transferee's rights under this Article 4.5(a) and also the irrevocable authority of the Company to bind the Transferee under the Deed of Release.

(b)     If and to the extent that any Claimant transfers or otherwise disposes of all or part of its Claim after the Record Date:

(i)     the delivery of such Claimant's Entitlement by or on behalf of the Company to the Claimant or its Nominated Recipient, in the Designated Account, or to any Transferee recognised by the Company in accordance with Article 4.5(a); or

(ii)    if Distribution Instructions are not duly submitted in accordance with Article 6.1, the cancellation of such Claimants' Entitlement in the manner provided in Article 6.1(e),

shall be effective to discharge and extinguish any Liabilities as at the Restructuring Date or thereafter of any Debtor to any Transferee of such Claim arising directly or indirectly in relation to or arising out of or in connection with the relevant Claim.

## 4.6    Set off

No Claimant may set off a Claim acquired on or after 17 May 2010 against a claim that a Debtor or a Subsidiary of a Debtor has against that Claimant (whether actual or contingent).

## 4.7    Release

(a)     Each Claimant authorises the Company on the Distribution Date or as soon as reasonably practicable thereafter to enter into, execute and deliver as a deed, on behalf of each Claimant and any Transferee from such Claimant, the Deed of Release pursuant to which any and all claims of such persons against the parties named therein (the **"Release Parties"**) shall be waived and released (subject to the terms and conditions set out in such Deed of Release) fully and absolutely from the Restructuring Date.

(b)     On the Distribution Date or as soon as reasonably practicable thereafter, the Company shall enter into and deliver the Deed of Release as principal and on behalf of all Claimants pursuant to the authority conferred by this Article 4.7.

(c)     Each Claimant understands that all existing claims of the Claimants against the Company and (subject to the terms and conditions set out in the Deed of Release) the Release Parties shall be waived and released fully and absolutely from the Restructuring Date.

## 5.    DETERMINATION OF AGREED CLAIMS

## 5.1    Procedure

This Restructuring Plan will not come into effect unless the procedures set out in this Article 5 are carried out on or prior to the Distribution Date, as the case may be.

5.2    **Notification of Claims**

(a)    No Claimant shall be entitled to receive any Entitlements under the Restructuring Plan in respect of any Claim unless that Claim becomes an Agreed Claim in whole or in part.

(b)    Non- Exempt Claimants must notify the Company of their Claims in writing. Notification will only be effective if it is received by the Company on or before the Claims Submission Date and includes details of (i) the identity of the Non-Exempt Claimant; (ii) a description of the nature of its Claim and how such Claim arose; and (iii) the Outstanding Amount of its Claim. For the avoidance of doubt and subject to Article 5.2(c) below, the receipt by the Company of a Claim Form on or prior to the Claims Submission Date shall constitute notification for these purposes.

(c)    The following Claimants are not required to notify the Company of their Claims:

(i)    Eurobondholders are not required to notify the Company of their Claims. If the New Extraordinary Resolution is passed at any New Eurobondholders' Meeting, each Existing Trustee will submit, or procure the submission of, on their behalf, a Claim Form in respect of the outstanding amount in relation to which it acts as trustee.  If the New Extraordinary Resolution is not passed at any New Eurobondholders' Meeting, the Tabulation Agent will submit, or procure the submission of, on their behalf, a Claim Form in respect of the outstanding amount in relation to which it has received an Electronic Voting Instruction.

(ii)    Private Placement Noteholders are not required to notify the Company of their Claims. The Tabulation Agent will submit, or procure the submission of, on their behalf, a Claim Form in respect of the outstanding amount in relation to which it has received an Electronic Voting Instruction.

(iii)    Domestic Bondholders are not required to notify the Company of their Claims. The Company shall determine the identity of each Domestic Bondholder and the outstanding amount of its Claim based on the lists of Domestic Bondholders as at, in relation to Claims in respect of principal, the Record Date, and in relation to Claims in respect of coupons falling due for payment on or before 31 December 2010 but unpaid, the date on which such coupons became due and payable.

(iv)    Preference Shareholders are not required to notify the Company of their Preference Share Debt Claims. The Company shall determine the identity of each Preference Shareholder and the Outstanding Amount of its Preference Share Debt Claim based on its register of Shareholders as at the Record Date.

(v)    Operational Debt Claim holders are not required to notify the Company of their Operational Debt Claims. The Company shall determine the identity of each Operational Debt Claim holder and the Outstanding Amount of its Operational Debt Claim based on the relevant judgement for debt collection issued by the relevant court in Kazakhstan.

(vi)    DAMU is not required to notify the Company of the DAMU Debt Claim. The amount of the DAMU Debt Claim is equal to the DAMU Claim Amount.

5.3    **Agreement of Claims**

(a)     Each Claimant understands and irrevocably agrees that once the SIEC has approved the Restructuring Plan, no Claimant shall have any right to increase the amount of its Claim irrespective of whether such increase is based on real damage, any loss, moral damage or lost profit.

(b)     The value of each Claimant's Agreed Claim (other than DAMU's) shall be equal to that Claimant's Outstanding Amount. The value of DAMU's Agreed Claim shall be equal to the DAMU Claim Amount.

(c)     Claims may be admitted or agreed by the Company either for the whole amount claimed or for part of that amount.  The Company may reject a Claim in whole or in part.

(d)     Notwithstanding any other provision of the Restructuring Plan, the following shall be treated as Agreed Claims:

   (i)     if the New Extraordinary Resolution is passed at a New Eurobondholders' Meeting, Claims of Eurobondholders (or the Existing Trustees on their behalf) determined as at the Record Date based on the applicable register of Eurobonds and the records of the Clearing Systems in the aggregate amount specified in the relevant Claim Forms submitted by the Existing Trustees;

   (ii)    if the New Extraordinary Resolution is not passed at a New Eurobondholders' Meeting, Claims of Eurobondholders determined as at the Record Date based on the applicable register of Eurobonds and the records of the Clearing Systems in the aggregate amount specified in the relevant Claim Forms submitted by the Tabulation Agent on behalf of Eurobondholders in relation to which it has received an Electronic Voting Instruction;

   (iii)   Claims of Private Placement Noteholders of record on the Record Date as set out in the relevant Claim Form(s) submitted by the Tabulation Agent;

   (iv)    Claims of Domestic Bondholders determined pursuant to the lists of Domestic Bondholders produced by the Registrar as at, in relation to Claims in respect of principal, the Record Date, and in relation to Claims in respect of coupons falling due for payment on or before 31 December 2010 but unpaid, the date on which such coupons became due and payable;

   (v)     Claims of Preference Shareholders as determined pursuant to the Company's register of Shareholders as at the Record Date;

   (vi)    Claims of Operational Debt Claim holders as determined pursuant to the relevant judgement for debt collection issued by the relevant court in Kazakhstan; and

   (vii)   the DAMU Debt Claim in the DAMU Claim Amount.

(e)     Subject to Article 5.3(d), Claims shall not be capable of becoming Agreed Claims (in accordance with the provisions of the Restructuring Plan) unless and until a duly completed Claim Form in respect of that Claim (or part thereof) has been received by the Company, *provided that*, if and to the extent that a Claim is listed in Appendix 1 (*List of Designated Financial Indebtedness*) and the Company does not receive a Claim Form in respect of such Claim, the Company is entitled to deem that such Claim is an Agreed Claim in the amounts listed in Appendix 1 and/or that the Claimant in respect of such Claim is the creditor or agent listed in Appendix 1. Non-

Exempt Claimants shall provide the Company with such other information as the Company may reasonably require to enable the relevant Claim to be determined.

(f)     If the Company rejects any Claim in whole or in part, it shall prepare a written statement of its reasons for doing so and notify the relevant Non-Exempt Claimant that its Claim is a Disputed Claim as soon as reasonably practicable.

(g)     The Company shall endeavour to reach agreement with each Non-Exempt Claimant as to the validity and amount of its Disputed Claim. Any Disputed Claim so agreed shall be treated as an Agreed Claim for the purposes of the Restructuring Plan.

(h)     Where more than one person seeks to assert an Entitlement pursuant to the Restructuring Plan in respect of the same Disputed Claim (or part thereof), the Disputed Claim shall not become an Agreed Claim unless and until it shall have been determined to the Company's reasonable satisfaction (or by the Independent Adjudicator in accordance with Article 5.4) who is entitled to the relevant Entitlement and in what proportions.

(i)     In the event that the validity of a Claim (or part thereof) and/or the amount of a Claim (as included in the relevant Claim Form) has not been agreed by the Company on or before the Adjudication Reference Date, the Company shall refer that Claim (or disputed part thereof) to the Independent Adjudicator as a Disputed Claim, and send by electronic mail, facsimile or Post to the Non-Exempt Claimant concerned a notice to the effect that the Claim has become a Disputed Claim. Thereafter, the dispute between the Company and the Non-Exempt Claimant concerned regarding the Claim will be determined by the Independent Adjudicator in accordance with Article 5.4.

(j)     Notwithstanding any other provision of the Restructuring Plan:

(i)     all Previously Agreed Claims shall continue to be treated as Agreed Claims for all purposes of the Restructuring Plan and shall not be subject to re-adjudication in accordance with this Article 5; and

(ii)     no Previous Claimant shall be entitled to have its Claim(s) adjudicated in accordance with this Article 5.

5.4     **Adjudication of Disputed Claims**

(a)     After the Adjudication Reference Date, the Company may, at its option, request the LCIA to nominate a fit and proper person duly qualified to adjudicate on the issues related to any Disputed Claim (the "**Independent Adjudicator**") for the purposes of the Restructuring Plan.

(b)     The LCIA shall, subject to the exceptions below, nominate the same person in respect of all Disputed Claims. A different person will be nominated by the LCIA if:

(i)     the Company, the relevant Non-Exempt Claimant or the proposed Independent Adjudicator notifies the LCIA that there is, or may be, a conflict of interest in relation to the proposed Independent Adjudicator being appointed to determine such Disputed Claims; or

(ii)     the Independent Adjudicator considers and notifies the LCIA that, in his sole opinion due to the work he is undertaking in respect of other Disputed Claims, he will be unable to adjudicate the relevant Claim within the period

of one month from the date on which the Disputed Claim is referred to him by the Company.

(c)     The Company and/or the relevant Non-Exempt Claimant shall provide the Independent Adjudicator with copies of the correspondence between the parties and/or between Non-Exempt Claimants relating to the validity of a Disputed Claim and/or the calculation of the Claim and/or the relative entitlements of Non-Exempt Claimants to a Disputed Claim and any other relevant documentation. The Independent Adjudicator shall be entitled to call for copies of any further documentation he considers necessary to assist him to reach a conclusion on the issue and the Company and the Non-Exempt Claimant concerned (as appropriate) shall cooperate in providing such information.

(d)     In relation to any matter which is referred to the Independent Adjudicator, the Independent Adjudicator shall consider the papers and documents before him and shall, within 7 days of receipt of the records and information referred to in Article 5.4(b) above, send a notice to the person concerned stating whether the Independent Adjudicator requires:

(i)     further documents, data or information from the Non-Exempt Claimant or the Company in which case the relevant person or persons shall within 7 days after receipt of such request provide the Independent Adjudicator with the required documents, data or information; and/or

(ii)     the Non-Exempt Claimant (or his duly authorised representative) or the Company (or its duly authorised representative) to appear before him and address him on any matters he shall determine, in which case the Non-Exempt Claimant (or his duly authorised representative) or the Company (or its duly authorised representative) shall appear on such date and at such place as the Independent Adjudicator shall prescribe.

(e)     If the Independent Adjudicator requires a party (or his representative) to appear before him, he shall also give notice of this request to the other party and make arrangements to allow that other party to appear before him to respond to the evidence brought by such party, if desired by the other party, on such date and at such place as the Independent Adjudicator shall prescribe.

(f)     If the Independent Adjudicator requires the parties to appear before him, the Independent Adjudicator shall be entitled to prescribe and lay down such procedures or provisions as he in his absolute discretion deems appropriate for the purposes of assisting him in reaching his decision, and the Independent Adjudicator shall be entitled to call for such evidence, documents, data and information as he may require.

(g)     The Independent Adjudicator shall be entitled to consult with such advisors, including legal advisors and experts, as he may deem appropriate and, for the avoidance of doubt, all costs, charges, and expenses shall be paid in accordance with Article 5.5.

(h)     If, after 7 days of the request for further information pursuant to Article 5.4(c)(i), none has been provided or the person concerned fails to appear before the Independent Adjudicator pursuant to Article 5.4(c)(ii), then the Independent Adjudicator shall make such determination as he sees fit on the basis of information then available to him.

(i)    In adjudicating on any Disputed Claim being referred to him, the Independent Adjudicator shall act as an expert and not as an arbitrator.

(j)    Upon any Disputed Claim being referred to the Independent Adjudicator in accordance with Article 5.3(i), the Independent Adjudicator shall use his reasonable endeavours, on or before the expiration of 14 days from the date on which such Claim was referred to him by the Company, to certify in writing by electronic mail, facsimile or Post to the relevant Non-Exempt Claimant and the Company his determination in respect of the dispute concerning the Disputed Claim. If the Independent Adjudicator requires an extension of time in making his determination, he may, with the consent of the Company (such consent not to be unreasonably withheld), extend said period by such number of days as he and the Company shall agree.

(k)    Each determination made by the Independent Adjudicator pursuant to this Article 5.4 shall state the amount of the Disputed Claim that should be rejected (if any) and the Outstanding Amount of the Disputed Claim that should be admitted by the Company as an Agreed Claim (if any).

## 5.5    Directions for Payment of Remuneration

(a)    On the production of a certification (in accordance with Article 5.4(i)) in relation to a Disputed Claim, the Independent Adjudicator may make such directions in respect of payment of his reasonable remuneration and in respect of the reasonable costs, charges and expenses incurred by him, the Company or the relevant Non-Exempt Claimant as he shall think just. In particular, but without limitation, one party may be directed to pay remuneration and costs, charges and expenses of another party if, in the opinion of the Independent Adjudicator, any such party has made a claim, relied on a defence or otherwise howsoever conducted himself in relation to the adjudication in a manner which is frivolous, vexatious, or had no reasonable prospect of success.

(b)    If the Independent Adjudicator shall direct that any such reasonable remuneration, costs, charges and expenses be paid by the Company, the same shall forthwith be paid in full by the Company upon presentation of documentary evidence in relation to such remuneration, costs, charges and expenses.

(c)    If the Independent Adjudicator shall direct that any such reasonable remuneration, costs, charges and expenses be paid by a Non-Exempt Claimant, the same shall forthwith be paid in full by such Non-Exempt Claimant and, if not so paid, then, for the purposes of determining whether such Non-Exempt Claimant is entitled to participate in any distribution under the Restructuring Plan, any cash to which the relevant Non-Exempt Claimant would have otherwise been entitled shall be used, and any New Notes and GDRs to which the relevant Non-Exempt Claimant would otherwise have been entitled shall be sold by the Distribution Agent or the Company, as the case may be, to the extent necessary, to meet such reasonable remuneration, costs, charges and expenses, and such cash and/or the Net Proceeds of Sale of such sale, as the case may be, required to meet such liability shall be transferred to the Independent Adjudicator and the relevant Non-Exempt Claimant's Entitlement shall thereafter be reduced accordingly. The price, terms, timing and manner of such sale, and any currency exchange effected by the Distribution Agent or the Company, as the case may be, in connection with or related to such sale, shall be at the Distribution Agent's or the Company's, as the case may be, sole discretion and none of the Distribution Agent, the Company or the Creditors' Committee or any of the Advisors,

as the case may be, shall have any Liability for any loss or alleged loss arising from such a sale.

(d)     Subject to any directions which may be given by the Independent Adjudicator in accordance with Article 5.5(b), the Company shall pay all reasonable costs, charges and expenses incurred by the Independent Adjudicator in the course of exercising and performing his powers, duties and functions under the Restructuring Plan.

5.6     **Determinations by Independent Adjudicator**

(a)     The Independent Adjudicator's determination of any issue related to a Disputed Claim shall be final and legally binding on the Company and the Non-Exempt Claimant concerned. For the avoidance of doubt, there shall be no right of appeal on a decision of the Independent Adjudicator.

(b)     The Independent Adjudicator is not liable for anything done or omitted in the discharge or purported discharge of his functions as the Independent Adjudicator and there shall be no right to make any claim against the Independent Adjudicator in respect thereof unless the act or omission is shown to have been in bad faith. This applies equally to any employee or agent of the Independent Adjudicator.

(c)     Once a Disputed Claim, or part thereof, has been referred to the Independent Adjudicator for adjudication, and pending the determination of the Independent Adjudicator, the Company shall not treat the Disputed Claim (or the relevant part thereof) as an Agreed Claim. To the extent that the Independent Adjudicator in accordance with the provisions of Article 5.4 determines the validity and the Outstanding Amount of a Disputed Claim (or the relevant part thereof), that amount (if any) shall be treated as an Agreed Claim for the purposes of the Restructuring Plan.

6.     **DISTRIBUTION; FULL AND FINAL SETTLEMENT OF CLAIMS**

6.1     **Except with respect to Preference Shareholders and DAMU, the Distribution to each Claimant with an Agreed Claim shall be made in accordance with the following procedures:**

(a)     The Company will in the Information Memorandum provide the form and content of the Distribution Instructions to be provided by each Claimant, save as provided in Article 6.1(b), including certain representations and warranties as to matters relevant to determine compliance by the Company with applicable laws and regulations in distributing Entitlements to (or at the direction of) the person on whose behalf the Distribution Instructions are submitted.

(b)     the following Claimants are not required to submit Distribution Instructions:

(i)     Non U.S. Claimants whose Designated Financial Indebtedness is held in an account with the Clearing Systems. Their Entitlements will be distributed to the account with the relevant Clearing System in which the Designated Financial Indebtedness is held on the Distribution Date;

(ii)     Preference Shareholders who will receive their Entitlements in accordance with the Restructuring Plan on the Almaty business day immediately following the Note Redemption Date or as soon as practicable after the Note Redemption Date; and

(iii)    DAMU who will receive its Entitlement, on the Distribution Date, in such manner as separately agreed with the Company.

(c)    The Company will make an announcement (the "**Distribution Announcement**") by notice to the Existing Trustees and via a Regulatory Information Service, through the Clearing Systems and on the Company's website, specifying the expected Distribution Date (subject to any adjustment necessary to comply with any deadline set by the NBK or the SIEC regarding the Restructuring).

(d)    The Distribution Announcement will be made as soon as reasonably practicable after the date on which the SIEC issues an order approving the Restructuring Plan.  Subject to Article 6.1(b), each Claimant must give Distribution Instructions to the Company and the Tabulation Agent by the Distribution Submission Date.

(e)    The Company, the Depositary or the Distribution Agent shall, as may be applicable, on the Distribution Date procure the distribution of the relevant Entitlements to each Claimant in accordance with, subject to Article 6.1(b) above, its Distribution Instructions so long as such Distribution Instructions have been duly completed and submitted to the Company and/or the Tabulation Agent by the Distribution Submission Date, provided that:

(i)    neither the Company, the Depositary nor the Distribution Agent shall be required to distribute any Entitlement in circumstances where such distribution may be prohibited by any applicable law or so prohibited except after compliance with conditions or requirements which the Company, the Depositary or the Distribution Agent regards as unduly onerous, costly or disproportionate. If the address of a Claimant or a Claimant's Nominated Recipient supplied in the Distribution Instructions is in a particular jurisdiction and, in the opinion of the Company, the Depositary or the Distribution Agent, the allotment, issue or transfer of New Notes and/or GDRs pursuant to the Restructuring Plan to that Claimant or its Nominated Recipient may be prohibited by any relevant law or so prohibited except after compliance with conditions or requirements which the Distribution Agent, the Depositary or the Company regard as unduly onerous, then the Company, the Depositary or the Distribution Agent (if so directed by the Company) shall sell, or procure the sale of, the same and pay the Net Proceeds of Sale from such sale to that Claimant or its Nominated Recipient, as the case may be, in full satisfaction of that Claimant's rights under the Restructuring Plan. Any such sale shall be deemed to have been undertaken at the request and authorisation of the relevant Claimant and the Distribution Agent, the Depositary and the Company are irrevocably and unconditionally requested and authorised to (i) sell such New Notes and/or GDRs on behalf of such Claimant in the market; (ii) transfer the document(s) of title in respect of such New Notes and/or GDRs; and (iii) remit the Net Proceeds of Sale as soon as reasonably practicable to the relevant Claimant or its Nominated Recipient, as the case may be. The price, terms, timing and manner of the sale, and any currency exchange effected by the Company, the Depositary or the Distribution Agent in connection with or related to the sale or the proceeds of the sale, shall be at the Company's sole discretion, or that of any agent the Distribution Agent, the Depositary or the Company shall employ in connection with or related to such sale and neither the Distribution Agent, the Company, the Depositary, the Creditors' Committee nor any of the Advisors or any person acting on behalf of any or all of them shall have any Liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for such New Notes and/or GDRs; and

(ii)     if the operators of a Clearing System are unable or unwilling to provide clearing facilities in respect of the relevant New Notes and/or GDRs, or if for any other reason the Company so wishes, the obligations of the Company to transfer (or procure the transfer of) such New Notes and/or GDRs to a Claimant with an Agreed Claim shall be discharged by the transfer of New Notes and/or GDRs to the relevant Claimant or its Nominated Recipient (as appropriate) in certificated form.

(f)     To the extent that the Company or the Tabulation Agent do not receive valid Distribution Instructions by the Distribution Submission Date in relation to any Entitlements with respect to which Distribution Instructions are required to be given, the Company or the Tabulation Agent will on the Distribution Date transfer those Entitlements to an independent corporate service provider (the "**Independent Holder**").

(g)     The Independent Holder will hold the Entitlements on behalf of the Claimants concerned and the Company will have no further rights to or interest in those Entitlements, although the Company will join in with the Claimants in giving any necessary instructions to the Independent Holder. The Independent Holder's costs shall be paid by the Company.

(h)     To the extent that the Independent Holder has not in response to the instructions of the Claimants distributed all the Entitlements it holds within 120 days after the Restructuring Date, the unclaimed Entitlements shall be cancelled (without prejudice to the releases under the Restructuring Plan pursuant to Articles 4.1 and 4.7) and the remaining cash shall be returned to the Company. In respect of the distribution of GDRs, to the extent that the Independent Holder has not distributed the GDRs to the relevant International Claimants within 120 days after the Restructuring Date, the unclaimed GDRs will be cancelled and the relevant proportion of underlying deposited Shares will revert back as directed by the Company (without prejudice to the releases of claims and liabilities under the Restructuring Plan).

(i)     Fractional entitlements to New Notes and GDRs will be rounded down to the nearest whole in the case of GDRs and the nearest denomination in the case of New Notes.

(j)     The Distribution Agent shall as soon as possible following completion of the Distribution send to the Company, the ECAs, the Creditors' Committee and the Existing Trustees or their respective legal counsel the Restructuring Date Confirmation. In relation to the distribution of the GDRs, the Distribution Agent shall rely, for the purposes of the Restructuring Date Confirmation, on the confirmation by the Depositary to it that all GDRs have been distributed in accordance with this Article 6.

6.2     **Each Claimant agrees that the Distribution in the manner described in Articles 6.1 or, as the case may be, cancellation in the manner provided in Article 6.1(e) shall constitute full and final settlement of the Company's obligations to such Claimant under the Restructuring Plan and in respect of all Claims of such Claimant whether in its own right or in any other capacity.**

6.3     **If and to the extent that any Claimant transfers or otherwise disposes all or part of its Claim after the Record Date:**

(a)     the delivery of such Claimant's Entitlement by or on behalf of the Company to the Claimant or its Nominated Recipient, to the Designated Account, or to any Transferee recognised by the Company in accordance with Article 4.5(a); or

(b)      if Distribution Instructions are not duly submitted in accordance with Article 6.1, the cancellation of such Claimants' Entitlement in the manner provided in Article 6.1(e),

shall be effective to discharge and extinguish any Liabilities as at the Restructuring Date or thereafter of any Debtor to any Transferee of such Claim arising directly or indirectly in relation to or arising out of or in connection with the relevant Claim.

6.4    **No Claimant shall have any right to any distribution of its Entitlement other than in accordance with this Article 6 or as further detailed in the Distribution Instructions.**

7.    **TAXES**

Each Claimant shall bear the cost of any taxes, levies, duties or fees of any kind, nature or description whatsoever incurred thereafter as a result of, or in connection with, the settlement of its Claim pursuant to the Restructuring Plan, provided that the Company shall pay for any stamp, documentary and other similar taxes and duties (including any interest and penalties thereon or in connection therewith) which are payable in Kazakhstan upon or in connection with the issue and delivery of the Entitlements in accordance with the Restructuring Plan.

8.    **DISTRIBUTION AGENT ARRANGEMENTS**

8.1    **Consent to Escrow Arrangements**

All Entitlements except GDRs, the Letter of Obligation, the cash amounts payable to Preference Shareholders and to Claimants with Operational Debt Claims shall be delivered to the Distribution Agent and be held in escrow by the Distribution Agent such that, on the Distribution Date, the Distribution Agent may distribute them to Claimants with Agreed Claims in accordance with the Distribution Agent Agreement and the Restructuring Plan.

8.2    **Distribution Agent Agreement**

Prior to the Distribution Date, the Company will enter into an agreement with each of (i) the Distribution Agent setting out the terms on which the Distribution Agent will hold or procure to be held for it the Entitlements (save for the GDRs, the Letter of Obligation and the cash amounts payable to Preference Shareholders and to Claimants with Operational Debt Claims) and (ii) the Depositary setting out the terms on which the Depositary will hold or procure to be held for it the Deposited Shares on behalf of eligible Claimants.

9.    **GENERAL PROVISIONS**

9.1    **Costs**

(a)      Subject to Article 5.5, the Company will pay in full all costs, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of the Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the New Eurobondholders' Meetings and the New Claimants' Meeting (including the Existing Trustees' respective costs and legal expenses), the costs of obtaining the approval of the SIEC, and the costs of placing any notices required by the Restructuring Plan. For the avoidance of doubt, the Company will not be liable for any costs of any Claimant incurred in connection with its participation in the New Eurobondholders' Meetings and the New Claimants' Meeting.

(b)      Notwithstanding any other provision in the Restructuring Plan, the Company shall not be released or waived from any Liability to pay the fees and expenses of the advisors

to the ECAs and to Dunhill Finance Limited and of the Creditors' Committee or its advisors in relation to the Restructuring.

9.2    **Modifications of the Restructuring Plan**

(a)    At any time, including after the date of approval of the Restructuring Plan by the SIEC, the Company may, without the consent of the Claimants (or any of them), make a modification to any provision of the Restructuring Plan (other than to Article 3.1 and to this Article 9.2(a)) or to any procedures to complete the Restructuring (i) which are of a formal minor or technical nature or to correct a manifest error, (ii) to comply with any changes in mandatory provisions of law, (iii) which result in an increase to the principal amount or initial reference amount of any series of New Notes, to the Cash Element or the proportion of the Company's total issued common share capital represented by GDRs to be distributed and/or (iv) to postpone particular events or deadlines by which particular conditions or actions in respect of the Restructuring need to be satisfied and/or carried out so long as the postponement of the completion of the Restructuring is approved by the SIEC. In the event of any modification as a result of (ii) to (iv) the modifications are not to be, in the sole discretion of the Company, materially prejudicial to the interests of the Claimants and the Company shall give appropriate notice to the Claimants.

(b)    At any time, including after the date of approval of the Restructuring Plan by the SIEC, save for modifications to the Restructuring Plan made in accordance with Article 9.2(a), no other amendment to the Restructuring Plan will be effective without the prior approval of two thirds (by value) of Claimants.

9.3    **Payments on Days other than Business Days**

If any sum is due or obligation is to be performed under the terms of the Restructuring Plan on a date other than a Business Day, the relevant payment shall be made, or obligation performed, on the next Business Day.

9.4    **Assets and Liabilities subject to the Restructuring**

The Designated Financial Indebtedness will be restructured pursuant to, and in accordance with, the Restructuring Plan. No assets of the Company will be restructured in the course of the Restructuring.

9.5    **Actions carried out during the Restructuring**

On 19 May 2009, the Company and Astana Finance B.V., its Dutch finance subsidiary, announced their decision to suspend, as at 15 May 2009, payments of interest and principal on their international debt obligations and, in the case of the Company, to suspend principal payments on certain of its domestic debt obligations.

In June 2009, the FMSA suspended the Company's broker-dealer, investment portfolio management and banking licences. Later that month, the Company voluntarily decided to surrender these licences permanently. In May 2009, the Company was also determined by the FMSA to be in breach of capital adequacy requirements for banking conglomerates.

On 16 September 2009, the Company announced a moratorium on payments of interest on all of its domestic debt obligations and stated that, upon completing a review of its loan books, it expected its loan loss provisions for 2009 to be in the region of KZT88 billion to KZT90 billion. In the same month, however, the Company made some progress on the Restructuring by announcing the establishment of the Creditors' Committee. In November 2009, the

Company signed a term sheet with the Creditors' Committee which outlined the terms to be offered to creditors in connection with the Restructuring subject to the satisfaction of certain conditions precedent. In addition, a memorandum of understanding was entered into by the Company with the ECAs in which the indicative terms for the restructuring of its trade indebtedness and that of its subsidiary, AF Leasing, were set out.

In March 2010, the management board of the Company (the **"Management Board"**) was reduced from three to two members, and then subsequently increased to five members in May 2010. Furthermore, following an extraordinary meeting of shareholders in June 2010, a new board of directors of the Company (the **"Board of Directors"**) was appointed and Mr. Kintal Islamov was replaced by Mr. Marat Aitenov as Chairman of the Board of Directors of the Company. The Company's new management reassessed the financial position and prospects of the Group and renewed negotiations with the FMSA, the Creditors' Committee and the ECAs in relation to the Restructuring. As a result of the financial re-evaluation of the Group, the Company's new management determined that the previous cash flow projections which formed the basis of the Restructuring term sheet signed in November 2009 were overly optimistic and based on unrealistic assumptions as to the recovery of Kazakhstan's real estate market and the amount of time and effort required to institute legal enforcement procedures in respect of overdue loans. Accordingly, the Company proposed revised terms for the Restructuring in June 2010 and October 2010 which were both rejected by the Creditors' Committee and, in the case of the October proposal, by the ECAs as well.

The Restructuring regained momentum in March 2011 when changes to the restructuring laws of Kazakhstan were introduced that would allow the Company, as the holding company of a bank, to benefit from the restructuring regime which had previously only been available to Kazakhstani banks. Under this regime, the Company can, under the supervision of the FMSC and the Specialised Financial Court at the time, the NBK and the SIEC now, agree with two thirds of its affected creditors (by value) to a restructuring plan which will, as a matter of Kazakhstani law, bind all creditors. In July 2011, the Company entered into an agreement with the FMSC on the parameters for the Company's Restructuring under this restructuring regime and the commencement of the Restructuring under this regime was approved by the Specialised Financial Court on 29 July 2011.

In September 2011, the Company entered into a new term sheet with the Creditors' Committee which formed the basis of the terms and conditions of the Restructuring set out in the 2014 Information Memorandum. In March 2012, the Company entered into a new term sheet on the same commercial terms with the ECAs.

In June 2012, the Company published the Original Information Memorandum setting out, amongst other things, the terms of the Restructuring and the process by which these terms would be approved by Claimants. In accordance with the process set out in the Original Information Memorandum, the Original Restructuring Plan was approved by the requisite majority of Claimants at the Original Claimants' Meeting on 29 June 2012, the NBK on 4 July 2012 and the Specialised Financial Court on 31 July 2012.

On 20 March 2013, the Kazakh Ministry of Finance proposed tax law amendments which would result in the deferral for a maximum term of ten years of the corporate income tax payable by the Company on completion of the Restructuring (the **"Tax Law Amendments"**). From April to July 2013, the Company negotiated the detailed wording of the Tax Law Amendments with the Ministry of Finance and, once substantially agreed with the Ministry of Finance, drafts of the Tax Law Amendments were also submitted by the Company for discussion and approval to the Ministry of Economy and Budget Planning, the Ministry of Justice, the NBK and Samruk-Kazyna. At a meeting held by the Government on 9 August 2013, the text of the Tax Law Amendments was finalised by the Ministry of Finance and the Ministry of Economy and Budget Planning. The Tax Law Amendments were submitted to the

Parliament of Kazakhstan for consideration on 5 September 2013 and approved by the Parliament of Kazakhstan on 21 November 2013 and signed by the President of Kazakhstan on 5 December 2013.

On 18 December 2013, the management board of the NBK approved the application for a further extension to 1 July 2014 and, on 28 December 2013, the Specialised Financial Court gave similar approval.

On 14 February 2014, the Company published the 2014 Information Memorandum, which included, among other things, the 2014 Amendments. The 2014 Restructuring Plan was approved, in accordance with the Restructuring Law, by the requisite two-thirds (by value) majority of Claimants at the claimants' meeting held on 27 March 2014. The NBK and the Specialised Financial Court approved the 2014 Restructuring Plan on 7 April 2014 and 8 April 2014, respectively. On 14 May 2014, the SIEC, which succeeded the Specialised Financial Court as the competent court with jurisdiction over the Restructuring, endorsed the approval order of the Specialised Financial Court.

In April 2014, the Company and the Depositary established a global depositary facility with respect to the Newly Issued Shares and the 2014 GDRs representing 60 per cent. of the common share capital of the Company were issued and distributed to International Claimants.

In May 2014, as the Company was in the process of finalising the legal documentation to be entered into in connection with the distribution of the Entitlements pursuant to the 2014 Restructuring Plan and satisfying all key conditions precedent to completion of the Restructuring, the NBK informally informed the Company that it would not support the Restructuring so long as the transfer of the Private Shareholders' participation in the Company had not been implemented and until legal clarity as to which court was to have jurisdiction over the Restructuring after the abolition of the Specialised Financial Court had been reached. In a letter dated 30 July 2014 to the legal advisors to the Creditors' Committee, the NBK confirmed that its decision of 18 June 2014 to extend the Restructuring Deadline to 15 November 2014 was based on the need to give the Company time to address the above described issues.

The 1 July 2014 deadline for completion of the Restructuring was also further extended by the SIEC to 15 November 2014 on 1 July 2014. However, the issues that prevented the Restructuring from proceeding in May 2014 could not be resolved during the summer and therefore, the NBK and the SIEC, on 22 October 2014 and 6 November 2014, respectively, approved a further extension of the deadline for completion of the Restructuring to 31 May 2015.

On 18 October 2014, the Company and the Creditors' Committee entered into the Term Sheet Amendment.

The process to ensure that the Company can make available to International Claimants interests representing 99 per cent. of the total common share capital of the Company post-Restructuring has involved:

- the cancellation, with effect from 3 December 2014, of the global depositary receipts issued under the 2014 Deposit Agreement in accordance with the 2014 Restructuring Plan (the "**2014 GDRs**") previously held by International Claimants (and which represented 60 per cent. of the total common share capital of the Company), as contemplated by the 2014 Restructuring Plan itself and the 2014 Deposit Agreement;

- the establishment by the Company and the Depositary of an interim global depositary receipt facility (the "**Interim GDR Facility**") into which the Company has procured

the deposit of 60 per cent. of the Common Shares previously represented by the 2014 GDRs held by International Claimants with the Depositary, and the Depositary issuing global depositary receipts representing those Common Shares (the "**Interim GDRs**") to Dunhill Finance Limited ("**Dunhill**"), a company incorporated in the Republic of Ireland;

- the approval on 5 December 2014 by Shareholders holding at least 75 per cent. of the total voting share capital of the Company of a resolution increasing the authorised common share capital of the Company from 14,085,000 Common Shares to 714,085,000 Common Shares (and the aggregate share capital (including preference shares) of the Company from 16,010,000 shares to 716,010,000 shares);

- the resolution of the Board of Directors of 14 January 2015 to place 700,000,000 Common Shares;

- the announcement of the Company, pursuant to and in accordance with its corporate rules, of the offer to the existing Shareholders to acquire by way of pre-emption the 700,000,000 common shares of the Company;

- the exercise by the Depositary in accordance with the provisions of the Interim GDR Facility and an instruction by Dunhill of its pre-emptive rights and the subscription by it of 477,472,559 common shares; and

- the acceptance by the Depositary in accordance with the provisions of the Interim GDR Facility and an instruction by Dunhill of the Company's offer to subscribe for the remaining 221,827,441 common shares in relation to which the other existing Shareholders did not exercise their pre-emptive rights.

10. **ALIGNMENT OF INTERESTS OF SHAREHOLDERS AND CREDITORS WITH MANAGEMENT**

The Company intends to introduce a merit-based remuneration structure subject to the approval duly given of the Company's board of directors and its shareholders (after the Completion Date) in order to align the interests of key members of senior management more closely with those of its creditors and shareholders.

10.1 **Limitations on the activities of the Company**

(a) For so long as the Company owns 10 per cent. or more of the share capital of JSC Bank of Astana (previously known as JSC Bank Astana Finance) ("**Bank of Astana**"), the Company, in accordance with the FMSA Agreement, cannot enter into any transactions or arrangements with certain of its Subsidiaries which would result in the transfer of the Company's losses to those Subsidiaries.

(b) The Company will not repay or redeem any of its existing Indebtedness before the Distribution Date except for (i) Excluded Debt, (ii) Indebtedness arising out of the provision of services or goods necessary for its conduct of its operations in the ordinary course of business and (iii) its tax liabilities arising in the ordinary course of its business.

10.2 **Governing law and jurisdiction**

This Restructuring Plan shall be governed by, and construed in accordance with, the laws of the Republic of Kazakhstan and (subject as provided in Articles 5.4, 5.5 and 5.6) the competent court of the Republic of Kazakhstan shall have exclusive jurisdiction to hear and

determine any suit, action or proceeding and to settle any dispute which may arise out of the Restructuring or any provision of the Restructuring Plan, or out of any action taken or omitted to be taken under the Restructuring Plan or in connection with the administration of the Restructuring Plan and, for such purposes, the Claimants irrevocably submit to the jurisdiction of the competent court of the Republic of Kazakhstan, provided, however, that nothing in this Article 9.8 shall affect the validity of other provisions determining governing law and jurisdiction as between a Debtor and any of its Claimants, whether contained in any contract or otherwise.

10.3    **Procedure and timing of the Restructuring**

The table below sets out the expected timetable of principal events in relation to the Restructuring. If any of the times and/or dates specified below change, the revised times and/or dates will be notified to the Existing Trustee and to Claimants by announcement via a Regulatory Information Service and the Clearing Systems.

| Date | Event |
|------|-------|
| **6 March 2015** | **Publication of the Information Memorandum, which includes the Restructuring Plan and the Notices for the New Eurobondholders' Meetings and the New Claimants' Meeting.** |
| 20 March 2015 | The Company to place no less than US$200,000,000 in an account outside of Kazakhstan with a U.S. or European bank. |
| 20 March 2015 | Record Date (i.e. the date as at which the identity of Claimants is determined and after which Claims cannot be transferred). |
| 27 March 2015 | Deadline before which each Eurobondholder must submit the Electronic Voting Instruction to vote on the New Extraordinary Resolutions (**"Voting Instructions Deadline"**). <br><br> (*Electronic Voting Instructions must be received not later than 48 hours before the time of the meeting*) |
| 30 March 2015 | New Eurobondholders' Meetings <br><br> (*to be held after 21 clear days' notice following the publication of the Notices for the New Eurobondholders' Meetings*). |
| 31 March 2015 | Notice of adjourned New Eurobondholders' Meeting (if necessary). <br><br> (*It will be necessary to hold an adjourned Eurobondholders' meeting if the necessary quorum is not reached at any Eurobondholders' meeting*) |
| 10 April 2015 | Deadline before which each relevant Eurobondholder must submit an Electronic Voting Instruction for an adjourned New Eurobondholders' Meeting(s) (if required) (**"Adjourned Voting Deadline"**). <br><br> (*Electronic Voting Instructions must be received not later than 48 hours before the time of the meeting*) |
| 14 April 2015 | Adjourned New Eurobondholders' Meeting(s) (if required) <br><br> (*to be held not less than 14 nor more than 42 days after the date of the first New Eurobondholders' Meetings; at least 10 days notice of the Adjourned Eurobondholders' Meeting(s) must be given*). |
| 16 April 2015 | Claims Submission Date (the deadline for the submission of Claim Forms), voting deadline for the provision of proxy forms for the |

| Date | Event |
|---|---|
| | New Claimants' Meeting and Distribution Submission Date (the deadline for the submission of Distribution Instructions). |
| 20 April 2015 | The Company to prepare the register of Claims for voting purposes. |
| 21 April 2015 | Registration for the New Claimants' Meeting. |
| **21 April 2015** | **New Claimants' Meeting.** |
| 22 April 2015 | Publication by the Company of the minutes of the New Claimants' Meeting. |
| 22 April 2015 | Submission to the NBK of the Restructuring Plan. |
| 22 April 2015 | Submission of the Restructuring Plan to the SIEC for final approval. |
| 24 April 2015 | Announcement of the date of the SIEC hearing. |
| 29 April 2015 | Final hearing and the final approval of the Restructuring Plan by the SIEC. |
| 30 April 2015 | Publication by the Company on its website of the SIEC order approving the Restructuring Plan. |
| 19 May 2015 | Publication by the Company of the Distribution Announcement indicating the Distribution Date. |
| **21 May 2015** | **Distribution Date** |
| 22 May 2015 | The Company submits to the NBK documentation confirming the completion of the Restructuring. |
| 26 May 2015 | The NBK submits a request to the SIEC for an order terminating the Restructuring on the basis of the provisions of the Restructuring Plan having been implemented. |
| **29 May 2015** | **The SIEC issues an order terminating the Restructuring on the basis of the provisions of the Restructuring Plan having been implemented (the "Completion Date").** |
| 15 June 2015 | Shareholders' Meeting to consider and vote on the resolutions, a form of which is included in Schedule 8 (*Form of Shareholders' Resolutions*) to the Information Memorandum. |

11.    **EXPECTED IMPACT OF THE RESTRUCTURING ON OTHER MEMBERS OF THE BANKING CONGLOMERATE**

As a result of failure by the Company to comply with a number of prudential regulations, the board of the FMSA adopted the following resolutions:

(a)    Resolution No. 7 dated 1 February 2010, "On the withdrawal of the status of bank holding company in relation to Bank of Astana issued to the Company, and repealing Resolution No. 52 dated 28 March 2008 "On consenting JSC Astana Finance to acquire the status of bank holding company in relation to Bank of Astana"; and

180

(b)     Resolution No. 6 dated 1 February 2010, "On the withdrawal of the status of major shareholder of JSC Insurance Company Astana Finance (the "**AF Insurance**") and of JSC Life Insurance Company Astana Finance (the "**AF Life Insurance**") issued to the Company, and repealing Resolutions No. 29 dated 26 February 2008 "On consenting JSC Astana Finance to acquire the status of major shareholder of the newly established AF Insurance " and repealing Resolution No. 30 dated 26 February 2008 "On consenting JSC Astana Finance to acquire the status of major shareholder of the newly established AF Life Insurance".

On 1 February 2010, the board of the FMSA also resolved that, by 1 April 2010, the Company must reduce its participation in Bank of Astana, AF Insurance and AF Life Insurance to a level below 10% of the total voting shares of each of these financial institutions. This deadline was not met at the time, but, the Company then sold AF Insurance and AF Life Insurance in 2011. On 19 March 2010, FMSA and the members of the Astana Finance banking conglomerate (which comprised the Company, Bank of Astana, AF Life Insurance, AF Insurance, JSC Brokerage Company Astana Finance (the "**AF Brokerage**") and JSC AF Mortgage (formerly, JSC Mortgage Organisation Astana Finance, "**AF Mortgage**") entered into the FMSA Agreement.

On 19 May 2010, in order to limit the impact of the Company's Restructuring on the activities of Bank of Astana, AF Insurance and AF Life Insurance, the Company entered into a trust management agreement with Samruk-Kazyna pursuant to which 90% of the shares in Bank of Astana, 100% of the shares in AF Insurance and 100% of the shares in AF Life Insurance were transferred to Samruk-Kazyna for a period of one year. This trust management agreement was not renewed.

In September 2011, AF Mortgage surrendered its operating licence and the Supplemental Agreement No. 1 to the FMSA Agreement was executed on 21 October 2011 in order to exclude AF Mortgage from the FMSA Agreement.

As a result of the Company selling AF Insurance and AF Life Insurance in October and November 2011, respectively, the Supplemental Agreement No 2 to the FMSA Agreement was executed on 23 December 2011 to exclude AF Insurance and AF Life Insurance from the FMSA Agreement.

Currently, the NBK regulates the activities of two subsidiaries of the Company – AF Brokerage and Bank of Astana. Accordingly:

(i)     the Company intends to arrange for the surrender of AF Brokerage's operating licence as soon as restrictions imposed on certain client accounts and investment funds under AF Brokerage's management are lifted. These restrictions have been imposed as a result of the criminal investigation being conducted by the Kazakhstan authorities with respect to Mr K. Islamov.

(ii)     as a result of the Company's failure to comply with the requirements stipulated by Clause 2 of Article 47-1 of the Law of the Republic of Kazakhstan "On Banks and Banking Activity in the Republic of Kazakhstan", on 1 July 2011 the NBK withdrew Bank of Astana 's licence to accept retail deposits and open and administer retail account. On 31 March 2014 Bank of Astana regained these rights. Pursuant to the FMSA Agreement, the Company does not carry out any transactions with Bank of Astana which could put the latter at risk.

Resolution No. 152 of the board of the NBK of 30 September 2011 set a deadline by which Bank of Astana's shareholders ought to comply with the capital requirements of Resolution No. 140 of the board of the FMSA dated 2 September 2008 "On the minimal size of share

capital and shareholders' equity for 2nd tier banks" through the sale of Bank of Astana to third party investors before 1 March 2012. Subsequently, this 1 March 2012 deadline has been amended by Resolution No. 52 of the board of the NBK of 24 February 2012 to bring it in line with the deadline for the completion of the Restructuring as established by the relevant court with jurisdiction over the Restructuring.

On 21 January 2013, the Company entered into an agreement to sell Bank of Astana to Mr Kenes Rakishev and Mr Olzhas Tokhtarov (the "**Buyers**") for a total of KZT2.9 billion (the "**Bank of Astana Sale Agreement**"). Pursuant to the Bank of Astana Sale Agreement, 49% of the total voting shares in Bank of Astana have been transferred to the Buyers and the remaining 51% of these shares will be transferred to the Buyers within 10 working days of the Completion Date.

On 26 August 2013, Bank of Astana and Mr. Kenes Rakishev and Mr. Olzhas Tokhtarov (who, by virtue of owning 49.1% of the total voting share capital of Bank of Astana, have been granted by the NBK the status of major participant) received a letter from the FMSC stating that Bank of Astana remained in violation of the minimum capital requirements and that the Buyers should take measures to increase the capital of Bank of Astana to a size sufficient to ensure its financial stability and not less than the minimum amount established by the applicable regulations.  On 31 December 2013, the Buyers recapitalised Bank of Astana to a level which satisfied the FMSC requirements by making a capital contribution to Bank of Astana in cash in the total amount of KZT5.1 billion by way of subscription for new shares issued by Bank of Astana. Bank of Astana is now in compliance with prudential requirements.

After the surrender of its operating licence, the Company's Restructuring no longer has any significant impact on AF Mortgage's activities.

The Company also owns several other subsidiaries, whose activities are not regulated by the NBK:

- AF Leasing;

- Astana Finance B.V.

- OJSC AF Bank ("**AF Bank Russia**");

- LLP Microcredit Organisation Astana Finance (the "**AF Microcredit**");

- JSC Credit Company Astana Finance (the assets and liabilities of this subsidiary were transferred to AF Mortgage in accordance with the decision of the board of directors of the Company dated 30 December 2011. JSC Credit Company Astana Finance ceased to exist on 3 May 2012); and

- LLP AF Development.

In the Restructuring, the financial obligations of Astana Finance B.V. in respect of Eurobonds will be recognised as liabilities of the Company as a result of the guarantees given by the Company in favour of the relevant Existing Trustee in respect of each series of Eurobonds (the "**Eurobond Guarantees**").  Under Kazakhstan law, the Company's obligation to repay the notes issued by the Company to Astana Finance B.V. in return for the proceeds of the Eurobonds, will be set-off against Astana Finance B.V.' obligation to reimburse the Company for payments under the Eurobond Guarantees. The Company intends to arrange for the solvent liquidation of Astana Finance B.V. after completion of such set-off.

Restructuring of the obligations of the Company will have an impact on the activities of AF Leasing because of the termination of the Company's obligations under guarantees issued by the Company in respect of AF Leasing's obligations as borrower under certain trade financing and other commercial loans. AF Leasing ceased originating finance leases in August 2011 and will continue to focus on debt collection in respect of its existing finance lease portfolio and repaying its intra-group loan with the Company using these debt collection proceeds.

The Restructuring of the Company will have no significant impact on the activity of AF Bank Russia. On 17 April 2014, the Central Bank of the Russian Federation revoked AF Bank Russia's license to conduct banking operations. On 7 July 2014 the Arbitration Court of the Republic of Bashkortostan declared AF Bank Russia insolvent, insolvency proceedings were initiated and the State Corporation "Deposit Insurance Agency" was appointed as insolvency administrator.

The Restructuring of the Company will have no significant impact on the activity of AF Microcredit. The loan portfolio of AF Microcredit and a part of its intra-group liabilities with equivalent value to the portfolio were transferred to AF Mortgage on 6 August 2014. The Company is now considering initiating voluntary insolvency proceedings in relation to AF Microcredit.

LLP AF Development was established by the Company to manage the real estate owned by the Group. The Restructuring of the Company has no material impact on its operations.

As a result of collecting on collateral from insolvent borrowers, the Company is now in possession of shares/stakes in the authorised share capital of four companies that are now part of the Group:

- LLP Astana Logistics, which provides warehouse facilities;

- LLP ENKI, which produces ceramic bricks used in construction;

- LLP Nerud Kokshetau, which manufactures cubical fieldstone construction materials; and

- JSC Stroyplastmass, which produces various plastic products used in construction.

Operating activities of these four companies are not affected by the Restructuring of the Company. The Company plans to sell the shares of LLP ENKI and LLP Nerud Kokshetau in the future and the sale proceeds will be allocated towards the repayment of the New Notes to be issued upon completion of the Restructuring. The Company plans to sell the shares of JSC Stroyplastmass in 2018 and the forecast proceeds from the sale are included in the projected income on the Company's loan portfolio. The Company expects to sell the assets of LLP Astana Logistics in 2015 and the forecasted proceeds from the sale are included in the projected income on the Company's loan portfolio.

12.    **EXPECTED FINANCIAL RESULTS OF THE RESTRUCTURING**

The following table sets out the pro forma capitalisation of the Company and the Group as at 31 December 2014 in KZT:

| Unaudited as at 31 December 2014 After Restructuring (consolidated) | Unaudited as at 31 December 2014 Before Restructuring (consolidated) | Audited as at 31 December 2013 Unadjusted (consolidated) |
| --- | --- | --- |

| | KZT thousands | KZT thousands | KZT thousands |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents...... | 911,750 | 52,581,403 | 39,062,686 |
| Financial instruments at fair value through profit or loss ... | 2,005,014 | 2,005,014 | 2,048,511 |
| Available-for-sale financial assets........................................ | 4,529,496 | 4,529,496 | 4,754,940 |
| Due from banks ..................... | - | 1,865,582 | 279,551 |
| Loans to customer .................. | 11,282,283 | 12,451,349 | 15,980,170 |
| Finance lease receivables ....... | 6,740,036 | 6,740,036 | 10,300,433 |
| Investment property................ | 490,366 | 490,366 | 1,525,329 |
| Inventory................................ | 7,221,076 | 7,221,076 | 2,313,906 |
| Property, equipment and intangible assets...................... | 5,443,249 | 5,443,249 | 6,510,428 |
| Current tax asset | 1,250,336 | 1,250,336 | 1,341,801 |
| Other assets............................ | 15,718,939 | 15,718,939 | 15,906,979 |
| Assets classified as held-for-sale .................................... | 26,852,959 | 26,852,959 | 26,852,959 |
| **Total assets ...........................** | **82,445,504** | **137,149,805** | **126,877,693** |
| | | | |
| **LIABILITIES** | | | |
| Due to banks and other financial institutions ............... | - | 64,583,217 | 53,481,395 |
| Debt securities issued ............. | - | 251,988,771 | 225,134,978 |
| Due to state organisations ...... | 2,474,477 | 2,474,477 | 2,904,127 |
| Provisions on contingent liabilities ............................... | 110,754 | 110,754 | 24,723 |
| Current tax liability ............... | 10,163,196 | - | 40,437 |
| Deferred tax liability ............. | 61,760 | 61,760 | 61,760 |
| Subordinated debt.................... | 10,035,008 | 26,090,952 | 26,310,722 |
| Debt component of preferred shares ...................... | 474,314 | 474,314 | 399,198 |
| Other liabilities...................... | 1,162,455 | 37,878,683 | 38,861,060 |
| Liabilities classified as held-for-sale........................... | 26,852,959 | 26,852,959 | 26,852,959 |
| **Total liabilities ....................** | **51,334,923** | **410,515,887** | **374,071,359** |
| | | | |
| **DEFICIT** | | | |
| Share capital ........................... | 29,950,264 | 29,949,565 | 29,949,565 |
| Share premium ........................ | 4,908,291 | 4,908,291 | 5,669,631 |
| Revaluation reserve for available-for-sale financial assets...................................... | 3,246,905 | 3,246,905 | 3,238,984 |
| Cumulative translation reserve..................................... | 143,842 | 143,842 | 72,117 |
| Accumulated deficit ............... | (7,138,721) | (311,614,685) | (286,123,963) |
| Total equity (deficit)............... | 31,110,581 | (273,366,082) | (247,193,666) |
| **Total liabilities and equity (deficit)................................** | **82,445,504** | **137,149,805** | **126,877,693** |

# APPENDIX 1

## LIST OF DESIGNATED FINANCIAL INDEBTEDNESS

The List of Designated Financial Indebtedness has been prepared in the following way: (i) International Claimants listed therein have been identified as at 1 February 2014, on the assumption that all Claims are blocked and cannot, therefore, have been traded since that date (the Company has at the date herein not been notified by any International Claimant of the transfer of any Claim), and Domestic Claimants listed therein have been identified as at 1 February 2015, (ii) the outstanding amount of their claim (except in relation to Operational Debt Claims, Preference Share Debt Claims and the DAMU Debt Claim) has been determined as at 31 December 2010, and (iii) amounts have been converted from EUR, CAD, CHF and JPY to USD and from RUR and USD to KZT, as applicable, by using the relevant exchange rates included in Article 4.2 of the Restructuring Plan.

The outstanding amount of Preference Shareholders Claims, Operational Debt Claims and the DAMU Debt Claim have been determined as follows: (i) in respect of each Preference Shareholder, the amount of unpaid dividends calculated, in accordance with the applicable relevant laws in Kazakhstan and the Company's Charter, in respect of the holdings specified against the name of the relevant Preference Shareholder on the Company's register of Shareholders; (ii) in respect of holders of Operational Debt Claims, by reference to the relevant order of the relevant court in Kazakhstan; and (iii) in respect of the DAMU Debt Claim by reference to: (a) the Principal Amount of the DAMU Debt Claim plus any interest accrued on such Principal Amount (but excluding any Default Interest) up to but excluding the date of the expected date of the New Claimants' Meeting in accordance with the Expected Timetable of Principal Events included in Article 9.9 of the Restructuring Plan, for the purpose of calculating the value of the DAMU Debt Claim determining the value to be voted by DAMU at the New Claimants' Meeting, and (b) the expected DAMU Claim Amount on the assumption the Distribution Date will fall on the date indicated in the Expected Timetable of Principal Events included in Article 9.9 of the Restructuring Plan, for the purpose of calculating the value of the DAMU Debt Claim for any other purpose.

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | International debt | | | | |
| Eurobonds | Astana Finance B.V. | JP Morgan | XS0275278256 | 16 November 2006 | 175,000,000 | USD | 206,866,349 | 206,866,349 | 38,156,498,073 |
| Eurobonds | Astana Finance B.V. | Citi/ Deutsche | XS0304676637 | 8 June 2007 | 340,000,000 | EUR | 381,438,459 | 509,136,297 | 93,910,190,055 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| Eurobonds | Astana Finance B.V. | Credit Suisse | XS0359435012 | 25 April 2008 | 10,000,000 | USD | 14,181,623 | 14,181,623 | 2,615,800,362 |
| Eurobonds | Astana Finance B.V. | JP Morgan | XS0373189579 | 2 July 2008 | 35,000,000 | USD | 45,276,875 | 45,276,875 | 8,351,319,594 |
| Loan agreement | Astana Finance B.V. | Merrill Lynch | | 23 June 2006 | 22,000,000 | USD | 26,208,622 | 26,208,622 | 4,834,180,328 |
| Loan agreement | JSC Astana Finance | Standard Bank plc. | | 1 February 2007 | 20,000,000 | USD | 8,035,873 | 8,035,873 | 1,482,216,830 |
| Loan agreement | JSC Astana Finance | Chang Hwa Bank | | 8 March 2013 | 3,000,000 | USD | 3,443,946 | 3,443,946 | 635,235,784 |
| Loan agreement | JSC Astana Finance | Goldman Sachs | | 31 July 2013 | 10,000,000 | USD | 10,938,677 | 10,938,677 | 2,017,638,973 |
| Private placement notes | JSC Astana Finance | Nomura International Plc | XS0338313074 | 17 January 2008 | 11,000,000,000 | JPY | 11,974,156,539 | 146,937,107 | 27,102,549,453 |
| Private placement notes | JSC Astana Finance | OPPENHEIMERFUNDS, Inc. | XS0290775500 | 14 March 2007 | 55,000,000 | USD | 65,060,450 | 65,060,450 | 12,000,400,003 |
| Private placement notes | JSC Astana Finance | PETERCAM, S.A. | XS0290779320 | 14 March 2007 | 10,000,000 | EUR | 11,735,906 | 15,664,849 | 2,889,381,332 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 1/2003 | 23 August 2003 | 3,018,542 | EUR | 269,169.11 | 359,281 | 66,269,464 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 2/2003 | 27 July 2003 | 4,091,173 | EUR | 364,817.64 | 486,951 | 89,818,143 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 3/2003 | 26 August 2003 | 2,874,353 | EUR | 513,770.79 | 685,771 | 126,490,424 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 6/2004 | 27 May 2004 | 2,041,360 | EUR | 214,135.47 | 285,824 | 52,720,176 |
| Loan | JSC Astana | Landesbank Berlin AG | 8 (2005) | 27 June 2005 | 3,649,526 | EUR | 1,597,668.24 | 2,132,535 | 393,346,094 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| agreement | Finance | | | | | | | | |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 9 (2005) | 29 July 2005 | 6,367,616 | EUR | 3,341,257.26 | 4,459,842 | 822,617,900 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 10 (2005) | 4 October 2005 | 2,017,835 | EUR | 1,062,959.65 | 1,418,817 | 261,700,781 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 11 (2006) | 15 March 2006 | 980,795 | EUR | 408,078.66 | 544,695 | 100,469,010 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 7 (2007) | 26 February 2007 | 115,162 | EUR | 42,224.84 | 56,361 | 10,395,760 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 8 (2007) | 26 February 2007 | 1,067,502 | EUR | 391,406.42 | 522,441 | 96,364,303 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 9 (2007) | 26 February 2007 | 2,346,500 | EUR | 860,001.59 | 1,147,913 | 211,732,485 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 10 (2007) | 6 December 2007 | 458,671 | EUR | 340,107.86 | 453,969 | 83,734,592 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 12 (2007) | 11 December 2007 | 1,875,000 | EUR | 1,400,299.00 | 1,869,091 | 344,753,766 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 13 (2007) | 22 January 2007 | 652,584 | EUR | 480,387.59 | 641,212 | 118,271,477 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 14 (2007) | 1 March 2007 | 6,049,178 | EUR | 5,149,637.77 | 6,873,632 | 1,267,841,379 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 15 (2007) | 8 February 2007 | 9,923,000 | EUR | 8,107,339.00 | 10,821,511 | 1,996,027,743 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 16 (2007) | 28 June 2007 | 3,535,729 | EUR | 2,616,457.48 | 3,492,394 | 644,172,116 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 18 (2007) | 6 December 2007 | 2,723,319 | EUR | 2,595,788.09 | 3,464,805 | 639,083,310 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 19 (2007) | 28 June 2007 | 1,108,160 | EUR | 806,059.25 | 1,075,911 | 198,451,875 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 21 (2007) | 25 July 2007 | 8,712,234 | EUR | 7,370,427.98 | 9,837,897 | 1,814,600,170 |
| Loan agreement | JSC Astana Finance | Landesbank Berlin AG | 22 (2007) | 11 December 2007 | 10,625,000 | EUR | 10,318,420.53 | 13,772,818 | 2,540,396,256 |

187

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| Loan agreement | JSC Astana Finance | EDC | 12 (2006) | 11 April 2006 | 1,561,850 | USD | 819,097 | 819,097 | 151,082,442 |
| Loan agreement | JSC Astana Finance | EDC | 880-37970 | 13 September 2007 | 612,000 | USD | 450,332 | 450,332 | 83,063,737 |
| Loan agreement | JSC Astana Finance | EDC | 880-35563 | 30 March 2006 | 2,415,700 | USD | 1,021,659 | 1,021,659 | 188,445,003 |
| Loan agreement | JSC Astana Finance | EDC | 880-34454 | 24 December 2005 | 3,521,786 | USD | 1,497,708 | 1,497,708 | 276,252,241 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-001 | 20 March 2008 | 6,248,350 | USD | 6,190,789 | 6,190,789 | 1,141,891,031 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-002 | 20 March 2008 | 5,738,619 | CAD | 6,508,483 | 6,522,162 | 1,203,012,733 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-003 | 20 March 2008 | 510,000 | USD | 477,233 | 477,233 | 88,025,627 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-004 | 14 April 2008 | 11,071,632 | USD | 11,173,312 | 11,173,312 | 2,060,917,398 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-005 | 18 June 2008 | 5,738,617 | CAD | 6,294,761 | 6,307,991 | 1,163,508,860 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-006 | 11 July 2008 | 639,516 | USD | 632,618 | 632,618 | 116,686,390 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-007 | 27 January 2009 | 14,183,045 | USD | 15,127,222 | 15,127,222 | 2,790,216,098 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-008 | 12 November 2008 | 15,810,000 | USD | 16,860,286 | 16,860,286 | 3,109,879,753 |
| Loan agreement | JSC Astana Finance | EDC | 880-39813-009 | 25 November 2008 | 969,000 | USD | 1,028,914 | 1,028,914 | 189,783,187 |
| Credit agreement | JSC Astana Finance | KBC BANK NV | BHM-07048 | 27 July 2007 | 2,174,330 | EUR | 2,012,675 | 2,686,478 | 495,520,804 |
| Credit agreement | JSC Astana Finance | KBC BANK NV | N/A | 15 February 2008 | 5,538,286 | USD | 5,608,429 | 5,608,429 | 1,034,474,729 |
| Credit agreement | JSC Astana Finance | KBC BANK NV | N/A | 15 February 2008 | 2,339,391 | EUR | 2,442,785 | 3,260,580 | 601,413,932 |
| Loan | JSC Astana | Deutsche Bank SAE | N/A | 11 July 2007 | 11,379,892 | EUR | 10,442,497 | 13,938,433 | 2,570,943,896 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| agreement | Finance | | | | | | | | |
| Loan agreement | JSC Astana Finance | LBBW (Sachsen LB) | N/A | 28 February | 2,500,000 | EUR | 1,431,652 | 1,910,940 | 352,472,878 |
| Bill | JSC Astana Finance | Matrix BV | KZ 05.48 | 5 September 2005 | 236,902 | EUR | 63,439 | 84,677 | 15,618,689 |
| Loan agreement | JSC Astana Finance | UBS | 04.0246 | 6 December 2005 | 3,995,000 | CHF | 1,685,660 | 1,798,799 | 331,788,476 |
| Loan agreement | JSC Astana Finance | Export-Import Bank of the United States (Private Export Funding Corporation) | AP080331 | 11 March 2004 | 9,345,806 | USD | 956,545 | 956,545 | 176,434,725 |
| Loan agreement | JSC Astana Finance | Export-Import Bank of the United States (Private Export Funding Corporation) | AP081901 | 14 December 2005 | 17,981,865 | USD | 10,818,915 | 10,818,915 | 1,995,548,872 |
| Loan agreement | JSC Astana Finance | Export-Import Bank of the United States (Private Export Funding Corporation) | AP080465 | 26 May 2004 | 8,339,263 | USD | 1,714,260 | 1,714,260 | 316,195,257 |
| Credit agreement | JSC Astana Finance | Export-Import Bank of the United States (Deere Credit, Inc.) | AP083080 | 24 April 2007 | 9,431,048 | USD | 7,270,027 | 7,270,027 | 1,340,956,480 |
| Credit agreement | JSC Astana Finance | Export-Import Bank of the United States (Deere Credit, Inc.) | AP083460 | 15 February 2008 | 16,231,770 | USD | 15,236,046 | 15,236,046 | 2,810,288,685 |
| Credit agreement | JSC Astana Finance | Export-Import Bank of the United States (Deere Credit, Inc.) | AP083451 | 15 February 2008 | 14,416,000 | USD | 13,870,563 | 13,870,563 | 2,558,425,345 |
| Credit agreement | JSC Astana Finance | Export-Import Bank of the United States (Deere Credit, Inc.) | AP083548 | 15 February 2008 | 18,035,300 | USD | 3,397,381 | 3,397,381 | 626,646,925 |
| Credit agreement | JSC Astana Finance | Export-Import Bank of the United States (Deere | AP083455 | 15 February 2008 | 14,422,800 | USD | 13,763,324 | 13,763,324 | 2,538,645,112 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| | | Credit, Inc.) | | | | | | | |
| Currency swap | JSC Astana Finance | Nomura International plc | N/A | 17 December 2007 | USD 79 075 000/ JPY 8 950 000 000 | USD | 538,805 | 538,805 | 99,382,582 |
| Various transactions | JSC Astana Finance | Lehman Brothers International (Europe) (in administration) | - | 20 May 2008 | - | USD | 15,000,000 | 15,000,000 | 2,766,750,000 |
| Loan agreement | JSC Astana Finance Leasing company | Landesbank Berlin AG | 001-G (2006) | 7 August 2006 | 2,984,741.00 | EUR | 746,185.22 | 995,993 | 183,710,882 |
| Loan agreement | JSC Astana Finance Leasing company | Landesbank Berlin AG | G-006 | 30 May 2008 | 1,127,500.00 | EUR | 564,945.03 | 754,077 | 139,089,528 |
| Loan agreement | JSC Astana Finance Leasing company | Landesbank Berlin AG | G-004 | 3 April 2008 | 1,338,325.00 | EUR | 669,834.00 | 894,081 | 164,913,204 |
| Loan agreement | JSC Astana Finance Leasing company | Landesbank Berlin AG | G-008 | 28 July 2008 | 17,228,119.00 | EUR | 9,496,107.85 | 12,675,212 | 2,337,942,785 |
| Loan agreement | JSC Astana Finance Leasing company | LBBW (Sachsen LB) | №1 | 10 July 2006 | 2,172,439.00 | EUR | 220,033 | 293,696 | 54,172,149 |
| Loan agreement | JSC Astana Finance Leasing company | Vnesheconombank | 110100/989 | 23 September 2008 | 4,000,000.00 | USD | 1,595,463 | 1,595,463 | 294,283,150 |
| Loan agreement | JSC Astana Finance | KBC BANK NV | N/A | 12 July 2006 | 7,227,474.82 | EUR | 2,080,133 | 2,776,519 | 512,128,971 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| | Leasing company | | | | | | | | |
| Loan agreement | JSC Astana Finance Leasing company | EDC | 002-G (2007) | 8 February 2007 | 3,751,690.00 | USD | 1,577,834 | 1,577,834 | 291,031,481 |
| Loan agreement | JSC Astana Finance Leasing company | Landesbank Berlin AG | G-007 (2008) | 4 September 2008 | 458,066.68 | EUR | 237,674.33 | 317,243 | 58,515,446 |
| Loan agreement | JSC Astana Finance Leasing company | Deere Credit Inc. | N/A | 17 January 2007 | 10,319,468.00 | USD | 4,326,839 | 4,326,839 | 798,085,454 |
| Loan agreement | JSC Astana Finance Leasing company | Deere Credit Inc. | AP083831 | 19 November 2008 | 40,640,460.95 | USD | 28,896,352 | 28,896,352 | 5,329,932,126 |
| **International Debt (Total)** | | | | | | | | **1,351,221,171** | **249,232,745,074** |
| | | | | **Domestic Senior Debt** | | | | | |
| Domestic preferential bonds | JSC Astana Finance | | KZ2CKY07B162 | 18 May 2004 | 1,897,030,000 | KZT | 2,200,080,543 | 11,927,788 | 2,200,080,543 |
| Domestic preferential bonds | JSC Astana Finance | | KZPC1Y05D501 | 5 January 2005 | 4,393,670,000 | KZT | 4,630,928,180 | 25,106,686 | 4,630,928,180 |
| Domestic preferential bonds | JSC Astana Finance | | KZPC2Y07B505 | 22 June 2005 | 887,520,000 | KZT | 1,014,146,916 | 5,498,221 | 1,014,146,916 |
| Domestic preferential bonds | JSC Astana Finance | | KZPC3Y10B721 | 28 September 2006 | 244,386,000 | KZT | 276,665,318 | 1,499,948 | 276,665,318 |
| Domestic | JSC Astana | | KZPC1Y10C202 | 28 September 2006 | 5,051,578,800 | KZT | 5,718,808,167 | 31,004,653 | 5,718,808,167 |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| preferential bonds | Finance | | | | | | | | |
| Domestic preferential bonds | JSC Astana Finance | | KZPC3Y12C253 | 29 March 2007 | 6,155,824,000 | KZT | 7,000,095,262 | 37,951,181 | 7,000,095,262 |
| Domestic preferential bonds | JSC Astana Finance | | KZP01Y15D013 | 19 May 2008 | 18,089,190,10 0 | KZT | 21,138,198,588 | 114,601,239 | 21,138,198,588 |
| Domestic preferential bonds | JSC Astana Finance | | KZP02Y03D017 | 29 August 2008 | 3,657,136,800 | KZT | 4,445,121,665 | 24,099,331 | 4,445,121,665 |
| Domestic preferential bonds | JSC Astana Finance | | KZP03Y05D010 | 29 August 2008 | 4,993,660,000 | KZT | 6,047,322,260 | 32,785,699 | 6,047,322,260 |
| **Domestic Senior Debt (Total)** | | | | | | | | **284,474,746** | **52,471,366,897** |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Domestic subordinated debt** | | | | | |
| Domestic subordinated bonds | JSC Astana Finance | | KZPC1Y10B634 | 30 June 2005 | 311,116,700 | KZT | 354,908,104 | 1,924,143 | 354,908,104 |
| Domestic subordinated bonds | JSC Astana Finance | | KZPC2Y15B722 | 12 May 2006 | 5,801,610,000 | KZT | 6,547,936,287 | 35,499,790 | 6,547,936,287 |
| Domestic subordinated bonds | JSC Astana Finance | | KZPC2Y15C258 | 25 March 2008 | 7,061,544,200 | KZT | 8,365,889,875 | 45,355,868 | 8,365,889,875 |
| Domestic subordinated bonds | JSC Astana Finance | JSC "BTA BANK" | KZP08Y10C532 | 29 August 2008 | 9,990,260,000 | KZT | 12,017,172,751 | 65,151,384 | 12,017,172,751 |
| Guarantee obligation | JSC Astana Finance | Investment Fund of Kazakhstan JSC | N/A | 26 May 2008 | 506,629,817 | RUR | 547,838,626 | 7,900,519 | 1,457,250,746 |
| Guarantee obligation | JSC Astana Finance | JSC Bank Center Credit | №1 | 9 July 2008 | 12,000,000 | USD | 12,000,000 | 12,000,000 | 2,213,400,000 |
| **Domestic subordinated debt (Total)** | | | | | | | | **167,831,704** | **30,956,557,763** |

| Type of debt | Borrower / Issuer | Creditor / Agent / Dealer as at 1 February 2014 | Contract number / ISIN or NIN | Date of transaction / Issue Date | Initial amount of liability, in foreign currency | Currency | As at 31 December 2010 | Outstanding amount in USD | Outstanding amount in KZT |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Operational Debt Claims** | | | | | |
| Accounts payable | JSC Astana Finance | Cooperative of Apartment Owners of Residential Complex Miras | N/A | N/A | 3,267,332 | KZT | 3,365,652 | 18,247 | 3,365,652 |
| Accounts payable | JSC Astana Finance | LLP Developist | N/A | N/A | 13,992,557 | KZT | 14,412,333 | 78,137 | 14,412,333 |
| **Operational Debt Claims (Total)** | | | | | | | | **96,384** | **17,777,985** |
| | | | | **Preference Share Debt Claims** | | | | | |
| Preference Share Dividends | JSC Astana Finance | Preference Shareholders | N/A | N/A | 577,500,000 | KZT | 577,500,000 | 3,130,930 | 577,500,000 |
| | | | | **DAMU Debt Claim** | | | | | |
| Loan agreement | JSC Astana Finance | JSC Entrepreneurship Development Fund "Damu" | 18 | 18 August 2008 | 5,570,910,000 | KZT | 1,674,712,174 | 9,079,491 | 1,674,712,174 |
| **TOTAL** | | | | | | | | **1,815,834,426** | **334,930,659,894** |

194

**APPENDIX 2**

**FORM OF DEED OF RELEASE**

**DATED [•] 2015**

**JSC ASTANA FINANCE**

**FINANCIAL RESTRUCTURING OF CERTAIN FINANCIAL INDEBTEDNESS OF JSC ASTANA FINANCE, JSC ASTANA FINANCE LEASING COMPANY, JSC AF MORTGAGE AND ASTANA FINANCE B.V.**



**DEED OF RELEASE**



REF: SJR/BP/50801-30020

**THIS DEED OF RELEASE** (the "**Deed**") is executed as a Deed on _____ ____ 2015

**BETWEEN:**

(1)     **JSC ASTANA FINANCE**, a joint stock company registered in accordance with the laws of the Republic of Kazakhstan under registered number 9146 1901 AO, whose registered office is at 12 Bigeldinov Street, Astana 010000, Kazakhstan (the "**Company**"); and

(2)     **THE CLAIMANTS** acting by the Company pursuant to the authority conferred upon the Company by the Claimants under Article 4.7 of the Restructuring Plan.

**WHEREAS:**

(A)     Pursuant to the provisions of the Restructuring Plan, each Claimant has authorised the Company to enter into and execute and deliver this Deed on its behalf.

(B)     The parties hereto have agreed to enter into and execute and deliver this Deed on the terms set out below.

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **In this Deed, unless the context otherwise requires or expressly provides:**

(a)     terms used herein and not otherwise defined have the meanings given to them in the Company's restructuring plan (the "**Restructuring Plan**" contained in Schedule 1 to the Information Memorandum of the Company dated 6 March 2015 (as amended or supplemented as at the date of this Deed, the "**Information Memorandum**");

(b)     "**Claims**" means all or any actions, claims, demands or rights whatsoever in relation to or arising out of or in connection with the Designated Financial Indebtedness and/or the implementation of the Restructuring, howsoever arising, whether present, future, prospective or contingent, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation, and whether arising in any jurisdiction or in any manner whatsoever;

(c)     reference to any article, without further designation, shall be construed as a reference to the article of this Deed so numbered;

(d)     headings are for convenience only and shall not affect the interpretation of this Deed;

(e)     reference to any act, statute or statutory provision shall include a reference to that provision as amended, re enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(f)     words importing the singular shall include the plural and vice versa, and words importing the masculine gender shall include the feminine or neutral gender; and

(g)     reference to a "person" includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors.

2.        **WAIVER, RELEASE AND CONFIRMATION**

2.1      **Subject only to the Distribution Agent issuing the Restructuring Date Confirmation, the Claimants hereby irrevocably and unconditionally waive and release, as at and from the Restructuring Date, on their own behalf, on behalf of any person to whom they may have transferred their Claims after the Record Date and in any other capacity, in each case to the fullest extent permitted as a matter of law, each and every Claim which they or any of them have or may have (including under any applicable bilateral investment treaty), against, whether in their own right or in any other capacity, each and all of:**

(a)        the Company;

(b)        the Subsidiaries of the Company;

(c)        Samruk-Kazyna or its Subsidiaries;

(d)        the Government;

(e)        the FMSC;

(f)        the NBK;

(g)        the directors and officers of the Company;

(h)        the Creditors' Committee;

(i)        the Existing Trustees;

(j)        the Independent Adjudicator;

(k)        the Depositary;

(l)        the Distribution Agent; and

(m)        the Advisors,

(collectively, the "**Release Parties**"),

*provided that* for the avoidance of doubt, no Liability in respect of any Claim is hereby admitted by any of the Release Parties.

2.2      **Notwithstanding any other provision of this Deed, no person shall have the benefit of a waiver of or be released from any Liability arising from gross negligence, fraud or wilful misconduct on the part of such person.**

2.3      **Notwithstanding any other provision of this Deed, the Company shall not have the benefit of a waiver of or be released from any Liability to pay the fees and expenses of the Existing Trustees, the Creditors' Committee and their respective advisors and the advisors to the ECAs.**

2.4      **The Claimants hereby irrevocably and unconditionally acknowledge and agree independently that:**

(a)        the Distribution and the issue of the Restructuring Date Confirmation shall constitute full and final settlement of all Claims and Liabilities waived and released pursuant to this Deed;

(b)    none of the members of the Creditors' Committee or their Advisors have verified any assertion contained in the Information Memorandum and that such persons have expressly disclaimed any responsibility for such assertions and that the members of the Creditors' Committee have not acted as fiduciary or adviser to any person and give no covenants and have no duties or obligations to any person in connection with the Restructuring (including, but not limited to, the exercise of any discretion in respect of the waiver or non-waiver of any conditions precedent in respect of the Restructuring); and

(c)    none of the members of the Creditors' Committee or its Advisors expresses any opinion on the Senior Management Remuneration Scheme or the increase of the aggregate amount of GDRs to be received by International Claimants as part of their Entitlements from representing not less than 60 per cent. of the total enlarged common share capital of the Company post-Restructuring to representing not less than 99 per cent. of the total enlarged common share capital of the Company post-Restructuring nor has any member of the Creditors' Committee or its Advisors verified any statement, assertion, information (financial or otherwise) or projection (together the "**Relevant Materials**") contained in the Information Memorandum and that such persons shall have no, and are hereby expressly released from, any responsibility or liability with respect to the Senior Management Remuneration Scheme, the issue of GDRs or any Relevant Materials and that the members of the Creditors' Committee have not acted as fiduciary or advisor to any person and give no covenants and have no duties or obligations to any person in connection with the Restructuring.

3.    **FURTHER ASSURANCE**

Each party shall at its own cost do and execute or procure to be done and executed all necessary acts, deeds, documents and things reasonably within its power to give effect to this Deed.

4.    **CONFLICT**

This Deed is expressly intended to supplement the obligations set out in the Restructuring Plan in relation to the waivers and releases to be given thereunder. If at any time there shall be any conflict between the provisions of this Deed and the provisions of the Restructuring Plan, the provisions of the Restructuring Plan shall prevail.

5.    **THIRD PARTIES**

Subject to the Company's Subsidiaries, Samruk-Kazyna, the Government, the FMSC, the NBK, the directors and officers of the Company, the Dealer Manager, the Creditors' Committee, the Existing Trustees, the Independent Adjudicator, the Distribution Agent and the Advisors (the "**Beneficiaries**") being able to enforce the waivers and releases in Article 2.1 above, a person who is not a party to this Deed shall have no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms. Notwithstanding the foregoing, the terms of this Deed may be modified or supplemented by the parties hereto without the consent of the Beneficiaries.

6.    **GOVERNING LAW AND JURISDICTION**

(a)    This Deed and any non contractual obligations arising out of or in connection with this Deed shall be governed by and construed in accordance with English law.

(b)      The courts of England have non-exclusive jurisdiction to settle any dispute (a "**Dispute**"), arising out of or in connection with this Deed (including a Dispute relating to the existence, validity or termination of this Deed or any non-contractual obligation arising out of or in connection with this Deed) or the consequences of its nullity.

**IN WITNESS WHEREOF** this Deed has been duly executed and delivered as a deed on the date first written above.

**SIGNATURE PAGE**

**EXECUTED AS A DEED**
by **JSC ASTANA FINANCE**

By:

Name:

Title:

In the presence of:

**EXECUTED AS A DEED**
for and on behalf of
**THE CLAIMANTS**
acting by **JSC ASTANA FINANCE**
duly authorised under Article 4.7 of the Restructuring Plan

By:

Name:

Title:

In the presence of: